Case No. 13-1230

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

### CSX TRANSPORTATION, INC., and
### NORFOLK SOUTHERN RAILWAY COMPANY

**Petitioners**

v.

### SURFACE TRANSPORTATION BOARD and
### UNITED STATES OF AMERICA

**Respondents**
_____

### On Petition for Review of Decision of the
### Surface Transportation Board
_____

### FINAL OPENING BRIEF OF PETITIONERS

Peter J. Shudtz                     G. Paul Moates
Paul R. Hitchcock                   Paul A. Hemmersbaugh
John P. Patelli                     Matthew J. Warren
CSX Transportation, Inc.            Sidley Austin LLP
500 Water Street                    1501 K Street, N.W.
Jacksonville, FL  32202             Washington, D.C.  20005
                                    (202) 736-8000
James A. Hixon                      (202) 736-8711 (fax)
John M. Scheib
David L. Coleman                    *Counsel for Petitioners CSX*
Norfolk Southern Corporation        *Transportation, Inc. and*
Three Commercial Place              *Norfolk Southern Railway Company*
Norfolk, VA  23510

Dated:  February 26, 2014

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties

The Petitioners in this appeal are CSX Transportation, Inc. ("CSXT") and Norfolk Southern Railway Company ("NS").

The Respondents in this appeal are the Surface Transportation Board ("STB") and the United States.

### B.     Corporate Disclosure Statements for Petitioners

CSX Transportation, Inc., a common carrier by railroad, is a wholly owned subsidiary of CSX Corporation ("CSX").  CSX is a Virginia corporation, and it has issued shares and debt securities to the public.  There is no publicly held company owning more than 10% of CSX.

Norfolk Southern Railway Company, a common carrier by railroad, is a wholly owned subsidiary of Norfolk Southern Corporation ("NSC").  NSC is a Virginia corporation, and it has issued shares and debt securities to the public. There is no publicly held company owning more than 10% of NSC.

### C.     Rulings Under Review

The decision under review was entered by the STB in *Rate Regulation Reforms*, STB Ex Parte No. 715 (served July 18, 2013).  The decision is not published at this time.  The decision will be the first document included in the deferred appendix.

i

**D.      Related Cases**

This case has not previously been in this Court.  No other cases involving substantially the same parties and the same or similar issues are currently pending in this court or any other federal court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF CONTENTS ................................................................. iii

TABLE OF AUTHORITIES .......................................................... vi

GLOSSARY .............................................................................. xi

STATEMENT OF JURISDICTION ..................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................1

STATUTES AND REGULATIONS ..................................................2

STATEMENT OF FACTS ..............................................................2

      A.    The Development of the Stand Alone Cost Approach.........................3

      B.    The Development of Simplified Approaches for Smaller Cases. .........6

      C.    The Ex Parte 657 and Ex Parte 646 Revisions to the STB's Rate Procedures. ...............................................................................8

      D.    Ex Parte 715 ............................................................................10

SUMMARY OF ARGUMENT ......................................................15

STANDING .............................................................................17

ARGUMENT ...........................................................................18

I.    THE STB'S DECISION TO REMOVE THE RELIEF CAP ON SIMPLIFIED-SAC CASES VIOLATES THE INTERSTATE COMMERCE ACT. ...................................................................18

II.   THE STB'S DECISION TO INCREASE THE MAXIMUM RELIEF CAP FOR THREE BENCHMARK CASES TO $4 MILLION WAS ARBITRARY AND CAPRICIOUS...........................................................27

A.    The STB's Rationale For Increasing the Three Benchmark Relief Cap Was Based on Flawed Evidence and Incorrect Calculations. .......................................................................29

B.    The STB Failed to Address How Its Increase of the Three Benchmark Relief Cap Undermined Its Rationale for Using Such A Flawed Approach. ................................................34

III.   THE STB'S NEW CROSS-OVER TRAFFIC REVENUE ALLOCATION RULE IS ARBITRARY AND CAPRICIOUS..................36

A.    The ATC Rule, the STB's Proposed Amendment, and Comments Questioning the Premise of the Proposal.........................37

1.    Commenters Demonstrated That The Revenue Allocation Scenario That Concerned The STB Was Consistent With The Principles Underlying ATC, Logical, And Provided No Basis for Departure from Revenue Allocations Fully Based on Relative Average Total Costs. ...................................40

2.    Comment Regarding STB-Proposed Limits On Use of Cross-Over Traffic Device........................................................47

B.    The STB Did Not Address Comments Demonstrating That the Purported Problem Was Illusory........................................................47

IV.   THE STB'S FAILURE TO ACKNOWLEDGE OR ADDRESS EVIDENCE THAT ITS INTEREST RATE PROPOSAL WAS BASED ON A FALSE PREMISE WAS ARBITRARY AND CAPRICIOUS...............................................................................................54

CONCLUSION ...............................................................................................57

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ........................59

CERTIFICATE OF SERVICE ......................................................................60

STATUTORY ADDENDUM .........................................................................1

A.    49 U.S.C. § 10701 .............................................................................2

B.    49 U.S.C. § 10704 .............................................................................4

iv

C.    49 C.F.R. § 1111.9 ................................................................6

D.    49 C.F.R. § 1141.1 (former version before amendment by
      *Decision*) ......................................................................9

E.    49 C.F.R. § 1141.1 (current version after amendment by
      *Decision*) ....................................................................11

# TABLE OF AUTHORITIES[1]

Page(s)

## CASES

*AEP Texas North Co. v. STB*,
  609 F.3d 432 (D.C. Cir. 2010)..................................................................36, 53

*Agri Processor Co. v. NLRB*,
  514 F.3d 1 (D.C. Cir. 2008)................................................................22

*Alabama Power Co. v. FCC*,
  773 F.2d 362 (D.C. Cir. 1985)................................................................32

*Ass'n of Private Sector Colleges and Univs. v. Duncan*,
  681 F.3d 427 (D.C. Cir. 2012)..................................................36, 47, 52

*Beverly Health & Rehab. Servs., Inc. v. NLRB*,
  317 F.3d 316 (D.C. Cir. 2003)................................................................23

*BNSF Ry. Co. v. STB*,
  526 F.3d 770 (D.C. Cir. 2008)................................................................37

*BNSF Ry. Co. v. STB*,
  604 F.3d 602 (D.C. Cir. 2010).......................................................14

*Bowsher v. Merck & Co.*,
  460 U.S. 824 (1983)................................................................22

*Burlington Northern R.R. Co. v. ICC*,
  985 F.2d 589 (D.C. Cir. 1993).......................................4, 5, 26, 34, 35

*Canadian Ass'n of Petroleum Producers v. FERC*,
  254 F.3d 289 (D.C. Cir. 2001).......................................................51

*Cape Cod Hosp. v. Sebelius*,
  630 F.3d 203 (D.C. Cir. 2011)................................................54, 55

*Chevron, U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984).......................................................18, 20

---

[1] Authorities on which Petitioners chiefly rely are marked with asterisks.

*City of New York v. FCC*,
    814 F.2d 720 (D.C. Cir. 1987).................................................................54

*Consolidated Rail Corp. v. United States*,
    812 F.2d 1444 (3d Cir. 1987) ...............................................................3

*\*CSX Transp., Inc. v. STB*,
    568 F.3d 236 (D.C. Cir. 2009), *vacated in part on other*
    *grounds*, 584 F.3d 1076 (D.C. Cir. 2009).....................................3, 5, 10, 20, 22

*Echostar Satellite LLC v. FCC*,
    704 F.3d 992 (D.C. Cir. 2013).................................................................23

*Forman v. Korean Air Lines Co.*,
    84 F.3d 446 (D.C. Cir. 1996)................................................................56

*\*Home Box Office, Inc. v. FCC*,
    567 F.2d 9 (D.C. Cir. 1977)............................................................49, 54

*\*Indep. Ins. Agents of Am., Inc. v. Hawke*,
    211 F.3d 638 (D.C. Cir. 2000)........................................................21, 23

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
    626 F.3d 84 (D.C. Cir. 2010)........................................................18, 52

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
    574 F.3d 748 (D.C. Cir. 2009)...............................................................33

*Lum v. Bank of America*,
    361 F.3d 217 (3d Cir. 2004) ................................................................56

*McDonnell Douglas Corp. v. United States Dep't of the Air Force*,
    375 F.3d 1182 (D.C. Cir. 2004)...............................................................52

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...........................................................29, 36, 47, 51, 55

*New England Power Generators Ass'n, Inc. v. FERC*,
    707 F.3d 364 (D.C. Cir. 2013).................................................................22

*\*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety*
    *Admin.*,
    494 F.3d 188 (D.C. Cir. 2007)........................................................36, 52, 53

*PPL Wallingford Energy LLC v. FERC,*
    419 F.3d 1194 (D.C. Cir. 2005)....................................................48, 49

*PSEG Energy Res. & Trade LLC v. FERC,*
    665 F.3d 203 (D.C. Cir. 2011) ................................................49

*Sherley v. Sebelius,*
    689 F.3d 776 (D.C. Cir. 2012)................................................49

*Sierra Club v. EPA,*
    294 F.3d 155 (D.C. Cir. 2002)................................................24

*Texas Office of Pub. Util. Counsel v. FCC,*
    265 F.3d 313 (5th Cir. 2001) ................................................33

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001)................................................21

*Union Pac. R.R. Co. v. STB,*
    628 F.3d 597 (D.C. Cir. 2010)................................................4, 27

*United States Satellite Broad. Co. v. FCC,*
    740 F.2d 1177 (D.C. Cir. 1984)................................................48

## STATUTES AND REGULATIONS

49 C.F.R. § 1111.9 ................................................11

5 U.S.C. § 706................................................47

28 U.S.C. § 2321................................................1

28 U.S.C. § 2342................................................1

28 U.S.C. § 2344................................................1

*49 U.S.C. § 10701........................ 1, 2, 3, 6, 7, 11, 15, 18, 20, 21, 22, 26

49 U.S.C. § 10704................................................2

49 U.S.C. § 10707................................................2, 34

ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803........................6, 7

AGENCY DECISIONS

*Class I R.R. Accounting and Fin. Reporting—Transp. of Hazardous Materials*,
STB Ex Parte No. 681 (Jan. 5, 2009) ................................................................25

*Coal Rate Guidelines—Nationwide*,
1 I.C.C.2d 520 (1985) ...................................................................................4, 43

*Coal Rate Guidelines—Nationwide*,
364 I.C.C. 360 (1980) .......................................................................................4

*Coal Rate Guidelines—Nationwide*,
ICC Ex Parte No. 347 (Sub-No. 1) (Dec. 21, 1981) ............................................4

*Duke Energy Corp. v. Norfolk Southern Ry. Co.*,
7 S.T.B. 89 (2003) ...........................................................................................31

*Major Issues in Rail Rate Cases*,
Ex Parte No. 657 (Sub-No. 1) (Oct. 30, 2006) ............................8, 13, 37, 40, 41

*M&G Polymers USA, LLC v. CSX Transp., Inc.*,
STB Docket No. NOR 42123 (Sept. 27, 2012) .................................................31

*Procedures to Calculate Interest Rates*,
9 I.C.C.2d 528 (1993) .......................................................................................54

*Public Serv. Co. of Colo. d/b/a Xcel Energy v. Burlington Northern & Santa Fe Ry. Co.*, STB Docket No. NOR 42057 (June 7, 2004)..............24, 26

*Rate Guidelines—Non-Coal Proceedings*,
1 S.T.B. 1004 (1996) ...........................................................................6, 7, 8, 19, 21

*Rate Regulation Reforms*,
STB Ex Parte No. 715 (July 25, 2012) ................... 10, 11, 12, 13, 14, 15, 36, 38, 39, 41, 46, 54, 55

*Rate Regulation Reforms*,
STB Ex Parte No. 715, (July 18, 2013) .... 1, 5, 11, 12, 15, 21, 22, 23, 24, 26, 27, 29,30, 31, 35, 42, 48, 51, 55

*Simplified Standards for Rail Rate Cases*,
STB Ex Parte No. 646 (Sub-No. 1) (July 26, 2006)....................................27, 28

*Simplified Standards for Rail Rate Cases,*
STB Ex Parte No. 646 (Sub-No.1), (Sept. 5, 2007) ..... 5, 8, 9, 10, 11, 19, 20, 27,
28, 32, 34, 35

*Simplified Standards for Rail Rate Cases*,
Ex Parte No. 646 (Sub-No. 1) (Mar. 17, 2008) ...................................................9

*Western Fuels Ass'n, Inc. v. BNSF Ry. Co.,*
STB Docket No. NOR 42088, (Sept. 10, 2007) ................................................14

*Western Fuels Ass'n, Inc. v. BNSF Ry. Co.*,
STB Docket No. NOR 42088, (Feb. 17, 2009) ................................................18

## OTHER AUTHORITIES

H.R. REP. NO. 96-1035 (1980), *as reprinted in*
1980 U.S.C.C.A.N. 3978 ....................................................................................4

S. REP. No. 104-176 (1995) ...............................................................................7, 23

# GLOSSARY

| | |
|---|---|
| AAR | Association of American Railroads |
| Alternative ATC | The version of the Average Total Cost methodology for allocating cross-over traffic revenues adopted in the *Decision*. |
| APA | Administrative Procedure Act, 5 U.S.C. §§ 550—559 |
| ATC | The Average Total Cost methodology for allocating cross-over traffic revenues, as initially proposed in *Major Issues in Rail Rate Cases*, STB Ex Parte No. 657 (Sub-No. 1) (Feb. 27, 2006). |
| CMP | Constrained Market Pricing |
| CSXT | Petitioner CSX Transportation, Inc. |
| *Decision* | The decision under review, *Rate Regulation Reforms*, STB Ex Parte No. 715 (July 18, 2013). |
| ICA | Interstate Commerce Act |
| ICC | Interstate Commerce Commission |
| ICCTA | Interstate Commerce Commission Termination Act of 1995 |
| *Major Issues* | *Major Issues in Rail Rate Cases*, STB Ex Parte No. 657 (Sub-No. 1) (Oct. 30, 2006), an STB decision that revised several aspects of SAC and adopted the ATC methodology. |
| Modified ATC | The modified version of the Average Total Cost methodology for allocating cross-over traffic revenues that the STB used in *Western Fuels Ass'n v. BNSF Ry. Co.*, STB Docket No. NOR 42088 (Sept. 10, 2007). |
| *NPRM* | The notice of proposed rulemaking for the decision under review, *Rate Regulation Reforms*, STB Ex Parte No. 715 (July 25, 2012). |

| | |
|---|---|
| NS | Petitioner Norfolk Southern Railway Company |
| R/VC | Revenue-to-variable cost ratio |
| SAC | The Stand Alone Cost approach, the STB's primary methodology for determining the reasonableness of rates, which was first adopted in *Coal Rate Guidelines*, 1 I.C.C.2d 520 (1985). |
| SARR | Stand Alone Railroad |
| Simplified-SAC | The Simplified Stand Alone Cost approach, an alternative methodology for determining rate reasonableness that was first adopted in *Simplified Standards* with a rate relief limit of $5 million over five years.  The *Decision* removes that rate relief limit. |
| *Simplified Standards* | *Simplified Standards for Rail Rate Cases*, STB Ex Parte No. 646 (Sub-No. 1) (Sept. 5, 2007), the STB decision that first created the Simplified-SAC and Three Benchmark methodologies as alternative approaches for rate reasonableness cases in which a full SAC presentation is impractical. |
| STB | Surface Transportation Board |
| Three Benchmark | The Three Benchmark approach, an alternative methodology for determining rate reasonableness that was first adopted in *Simplified Standards* with a rate relief limit of $1 million over five years.  The *Decision* raises that rate relief limit to $4 million. |
| TIH | Toxic by inhalation |
| URCS | Uniform Rail Costing System |

## STATEMENT OF JURISDICTION

Petitioners CSXT and NS challenge the Surface Transportation Board's ("STB's") July 19, 2013 decision adopting a final rule that made methodological changes to the STB's procedures for determining rate reasonableness. *See Rate Regulation Reforms*, STB Ex Parte No. 715 (July 18, 2013) ("*Decision*") [J.A.011]. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 2321(a) and § 2342(5).

The STB served the *Decision* on July 18, 2013, and Petitioners timely filed a joint Petition for Review on July 29, 2013. *See* 28 U.S.C. § 2344.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether the STB's decision to remove the maximum relief cap for rate reasonableness case complainants using a Simplified Stand Alone Cost methodology violates the Interstate Commerce Act's command that simplified rate methodologies be used only "in those cases in which a full stand-alone cost presentation is too costly, given the value of the case." 49 U.S.C. § 10701(d)(3).

2.      Whether the STB's decision to increase the maximum relief cap for rate reasonableness case complainants using a Three Benchmark methodology to $4 million—thus authorizing the use of a crude rate comparison methodology for the vast majority of regulated traffic—was arbitrary, capricious, or otherwise not in accordance with law.

3.      Whether the STB's failure to respond to comments demonstrating that its Average Total Cost methodology did not create "illogical results" was arbitrary, capricious, or otherwise not in accordance with law.

4.      Whether the STB's adoption of the U.S. Prime Rate as the interest rate for reparations on the ground that it correlates to market interest rates was arbitrary, capricious, or otherwise not in accordance with law in light of the STB's failure to respond to evidence that the Prime Rate in fact has no correlation to market interest rates.

## STATUTES AND REGULATIONS

The text of all pertinent statutes and regulations is reproduced in the Addendum.

## STATEMENT OF FACTS

Congress has given the STB the authority to determine whether certain rail rates are reasonable.[2]  *See* 49 U.S.C. §§ 10701, 10704.  The STB's *Decision* in this case made several significant changes to the agency's methods for assessing rate reasonableness.  One of these changes—to remove limitations on the relief obtainable via a simplified rate methodology—violates the Interstate Commerce Act ("ICA"), specifically Congress's command that the STB use less accurate

---

[2] This authority is subject to jurisdictional limitations not relevant here, such as the requirement that the STB find that a railroad possesses "market dominance" over a movement in order for the agency to have jurisdiction over the rate for that movement.  *See* 49 U.S.C. § 10707.

2

"simplified" methodologies only for cases in which a more rigorous Stand Alone Cost ("SAC") presentation is "too costly, given the value of the case."  49 U.S.C. § 10701(d)(3).  Other changes wrought by the *Decision* fail to comply with the Administrative Procedure Act ("APA"), either because they rely on insufficient data and basic arithmetic errors or because they were made without addressing significant public comments.

Explaining why the STB's actions violated both the ICA and the APA requires a "whistle-stop tour"[3] through the development of the SAC approach and simplified rate approaches and the evolution of those approaches over time.

### A.     The Development of the Stand Alone Cost Approach.

The STB's predecessor agency, the Interstate Commerce Commission ("ICC"), labored for many years to devise an economically valid methodology for determining rate reasonableness that balanced the railroads' need for adequate revenues to recover their substantial fixed costs with the desire to preserve an opportunity to seek rate relief for shippers who lack competitive alternatives to rail transportation.  *See Consolidated Rail Corp. v. United States*, 812 F.2d 1444, 1453-54 (3d Cir. 1987).  One reason that this balance is so difficult to strike is that railroad economics require some degree of "differential pricing," *i.e.*, charging lower rates to obtain business from shippers who have greater ability to shift that

---

[3] *Cf. CSX Transp., Inc. v. STB*, 568 F.3d 236, 238 (D.C. Cir. 2009), *vacated in part on other grounds*, 584 F.3d 1076.

business to another mode of transportation and conversely charging relatively higher rates to shippers who are more demand-inelastic. *See id.* The same Congress that charged the agency with ensuring that rail rates are "reasonable" also endorsed the use of differential pricing, thus requiring the ICC to develop a rate reasonableness methodology that allowed railroads some freedom to price services differentially.[4]

After failed attempts to judge rate reasonableness by relying on cost formulas[5] and rate comparison methodologies,[6] the ICC adopted an economically rigorous approach known as Constrained Market Pricing ("CMP") that established four independent constraints on rail rates. *See Coal Rate Guidelines—Nationwide*, 1 I.C.C.2d 520 (1985). The most commonly used constraint is Stand Alone Cost

---

[4] H.R. REP. No. 96-1035, at 39-40 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 3978, 3984-85; *see Union Pac. R.R. Co. v. STB*, 628 F.3d 597, 600 (D.C. Cir. 2010) ("By statute, rail carriers are authorized to engage in a certain amount of demand-based differential pricing in order to earn 'adequate revenues'").

[5] *See Coal Rate Guidelines—Nationwide*, 364 I.C.C. 360 (1980) (proposing maximum rate formula based on assigning fully allocated costs to particular traffic by ton-mile); *Coal Rate Guidelines—Nationwide*, Ex Parte No. 347 (Sub-No. 1) (Dec. 21, 1981) (rejecting ton-mile method because it did not incorporate demand or revenue adequacy).

[6] *See Burlington Northern R.R. Co. v. ICC*, 985 F.2d 589 (D.C. Cir. 1993) (rejecting rate comparison approach because agency failed to consider possibility that repeated application of averaging approach would artificially depress maximum allowable rates).

("SAC"), which is firmly rooted in sound economic theory[7] and which "seeks to determine whether a complainant is bearing costs resulting from inefficiencies or costs associated with facilities or services from which it derives no benefit." *Decision* at 5. A SAC analysis accomplishes this by allowing a complainant shipper to model a hypothetical stand-alone railroad ("SARR"), "a fully efficient hypothetical competitor railroad that serves the complaining shipper and other traffic sharing common facilities." *CSX Transp.*, 568 F.3d at 238. A challenged rate is unreasonable if the SARR would generate revenues that "exceed[] the costs (including a reasonable profit) of running the stand-alone railroad." *Id.* at 238-39.

The SAC methodology has proven to be the best available approach for assessing the reasonableness of railroad rates. Both the STB and the courts have endorsed SAC as the "preferred" and the "most accurate" rate reasonableness methodology available.[8] In the STB's words, "CMP is the most economically

---

[7] *Simplified Standards for Rail Rate Cases,* STB Ex Parte No. 646 (Sub-No. 1), at 13 (Sept. 5, 2007) ("*Simplified Standards*") ("The SAC test, which judges the reasonableness of a challenged rate by comparison to the rate that would prevail in a competitive market, rests on a sound economic foundation and has been affirmed by the courts.").

[8] *See, e.g., Burlington No. R.R.,* 985 F.2d at 596 ("CMP, with its SAC constraint, is the 'preferred and most accurate procedure available for determining the reasonableness' of rates in markets where the rail carrier enjoys market dominance.") (quoting *McCarty Farms, Inc. v. Burlington Northern, Inc.,* 3 I.C.C.2d 822, 839-40 (1987)); *Simplified Standards* at 13 ("CMP, with its SAC constraint, is the most accurate procedure available for determining the reasonableness of rail rates where there is an absence of effective competition.").

5

precise procedure available for evaluating the reasonableness of rates and should be used wherever possible." *Rate Guidelines—Non-Coal Proceedings*, 1 S.T.B. 1004, 1013 (1996) ("*Simplified Guidelines*").  "Non-CMP procedure[s] should be reserved for use only in those cases in which CMP cannot be used." *Id.*  Congress, too, has acknowledged that the SAC approach is the preferred methodology for ascertaining rate reasonableness, by authorizing the STB to use simplified methodologies only "in those cases in which a full stand-alone cost presentation is too costly, given the value of the case."  49 U.S.C. § 10701(d)(3).

### B.     The Development of Simplified Approaches for Smaller Cases.

By the time Congress enacted § 10701(d)(3) as part of the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 ("ICCTA"), the economically sound and court-approved SAC test was well established.  Nevertheless, the ICC was concerned that the cost and effort required for a properly developed SAC analysis could make it impractical for smaller rate cases.  The ICC instituted a proceeding to develop a simplified method for such smaller rate cases and considered several alternatives including a simplified SAC test.  *See Simplified Guidelines*, 1 S.T.B. at 1010-13 (detailing history of ICC rulemaking).

ICCTA ordered the STB to complete the ICC's unfinished rulemaking and statutorily recognized SAC as the preferred method for determining the reasonableness of rail rates:

> The Board shall, within one year after the effective date of this
> paragraph, complete the pending Interstate Commerce Commission
> non-coal rate guidelines proceeding to establish a simplified and
> expedited method for determining the reasonableness of challenged
> rates in those cases in which a full stand-alone cost presentation is too
> costly, given the value of the case.[9]

Congress thus limited any "simplified and expedited method" to "cases in

which a full stand-alone cost presentation is too costly, given the value of the

case."  Both this express language and legislative history show that Congress's

intent was to spur the agency to create a methodology to be used in a limited set of

circumstances and not to authorize the agency to replace SAC with a less rigorous

methodology:

> The Committee intends the simplified methodology directed to the
> Board to complete would apply to cases in which the full stand-alone
> cost presentation, which encompasses elaborate evidentiary
> presentations, are impractical.  The Committee seeks to assure that the
> rate complaint process is accommodating of small cases.  However,
> the Committee does not intend to erode the Constrained Market
> Pricing principles adopted by the ICC for full stand-alone cost
> presentations.

S. REP. No. 104-176, at 7-8 (1995) (emphasis added).

In response to this mandate, the STB adopted simplified rate guidelines.

*Simplified Guidelines*, 1 S.T.B. 1004.  The STB acknowledged that "any simpler

method will necessarily be cruder than CMP," but found that "[a]ccuracy must be

sacrificed for simplicity" in order to provide an avenue for rate challenges in low-

---

[9] ICCTA at § 102(a), 102 Stat. at 809 (codified at 49 U.S.C. § 10701(d)(3)).

7

value cases.  *Id.* at 1008.  Because simplified methods are rougher and less

accurate, the STB recognized that "the simplified procedures must be used as

sparingly as possible, reserved for only those cases where CMP is not a realistic

option."  *Id.* at 1021.

    **C.**    **The Ex Parte 657 and Ex Parte 646 Revisions to the STB's Rate Procedures.**

    In 2006, the STB instituted a rulemaking to refine several aspects of SAC.

*See Major Issues in Rail Rate Cases*, Ex Parte No. 657 (Sub-No. 1) (Oct. 30, 2006)

("*Major Issues*").  Of particular relevance here is the STB's adoption of a new

Average Total Cost ("ATC") methodology for allocating revenues generated by

"cross-over" traffic between the SARR and the residual incumbent (*i.e.*, traffic

assumed to move partially on SARR lines and partially on defendant lines not

replicated by the SARR).  *Major Issues* at 25, 33-34; *see infra* at 12-14.

    In 2007, *Simplified Standards* revised the STB's *Simplified Guidelines* into a

two-tiered system with different methodologies that could be used for small and

medium-sized cases.  For the smallest cases, the STB created the "Three

Benchmark" approach, which assesses the reasonableness of rates primarily

through a comparison of R/VC ratios between the challenged rate and a selected

group of "comparable" traffic.  *Simplified Standards* at 16-22.  Unlike SAC, this

crude comparison approach is not grounded in principles of railroad economics.

*Id.* at 53.

For mid-sized cases whose value did not justify a full-SAC analysis, the STB devised a "Simplified-SAC" methodology that included simplifying assumptions to streamline the analysis. *See id.* at 13-16. For example, while a full-SAC analysis requires the parties to develop evidence of operating costs for the SARR to handle the specific traffic the complainant selected, in a Simplified-SAC analysis operating costs are all estimated by using the defendant's own system-average costs generated by the STB's Uniform Rail Costing System ("URCS"). *See infra* at 24-25.

The STB recognized that the two simplified approaches were not as accurate as SAC and should not be "applied to a case when the amount in dispute justifies the use of a more robust and precise approach." *Id.* at 27. To limit the use of simplified procedures to those cases where a Full-SAC case is too costly given the value of the case, the STB limited the amount of relief that a shipper could recover under the simplified methodologies: $1 million over five years for Three Benchmark cases, and $5 million over five years for Simplified-SAC cases. *See id.* at 28-29. Hearkening back to § 10701(d)(3), the STB held that "the limits we have set strike the appropriate balance so that we do not open the door to excessive litigation under methods that are not justified for the amount in dispute." *Simplified Standards for Rail Rate Cases*, Ex Parte No. 646 (Sub-No. 1), at 8 (Mar. 17, 2008) (denying petitions for reconsideration).

9

The *Simplified Standards* rule was challenged on appeal on several grounds. *See CSX Transp.*, 568 F.3d at 239. Most relevant here is the challenge that a group of shippers brought to the proposed relief limits, which led this Court to conclude that § 10701(d)(3) "<u>clearly contemplates a method that may substitute for a full SAC proceeding in low-value cases.</u>" *Id.* at 242 (emphasis added). The Court concluded that the STB had used a reasonable method for determining the relief limits necessary to ensure that simplified methods applied only to "low-value cases." *Id.*

### D.    Ex Parte 715

In 2012 the STB instituted another rulemaking to further revise its procedures for rate reasonableness cases. *See Rate Regulation Reforms*, Ex Parte No. 715 (July 25, 2012) ("*NPRM*") [J.A.052]. The *NPRM* proposed four changes to the STB's procedures that are relevant here.

*First*, the STB proposed to remove the relief cap on Simplified-SAC cases. The STB argued that, in light of its parallel decision to require Simplified-SAC presentations to develop full road property investment costs for the replicated lines,[10] shippers should be able to use Simplified-SAC as an alternative

---

[10] A SAC analysis includes the "road property investment" costs of acquiring right-of-way for the SARR and constructing all necessary track and facilities. Under *Simplified Standards*, parties had to develop road property evidence for some costs, but could make several simplifying assumptions to develop other costs. *See*

10

methodology for all rate complaints with no relief cap, regardless of whether the value of the case was high enough to warrant the costs of a full-SAC presentation. *NPRM* at 13 [J.A.064].

Several commenters argued that 49 U.S.C. § 10701(d)(3) precluded the STB from using a simplified methodology without regard for the value of the case.[11] Moreover, railroads noted (1) that the simplifications inherent in Simplified-SAC could lead to inaccuracies compared to SAC that further counseled against its use in high-value cases; and (2) that the burden-shifting procedures of Simplified-SAC cases (which unlike SAC cases require defendants to generate much of the complainant's evidence in a "Second Disclosure") were inappropriate in a high-value case.[12] The STB found that § 10701(d)(3) did not limit its ability to apply simplified methodologies to high-value cases and adopted its original proposal. *See Decision* at 15-19 [J.A.025-029].

*Second*, the STB proposed to double the relief cap on Three Benchmark cases from $1 million to $2 million, arguing that the increased costs of Simplified-

---

*Simplified Standards* at 38-48.  The *Decision* requires parties to develop all costs as they would in a SAC case.

[11] *See, e.g.*, Opening Comments of CSXT & NS at 2-4 (filed Oct. 23, 2012) ("CSXT/NS Comments") [J.A.103-05]; Opening Comments of Association of American Railroads at 12-13 (filed Oct. 23, 2012) ("AAR Comments") [J.A.075-076].

[12] *See, e.g.*, CSXT/NS Comments at 6-11 [J.A.107-12]; AAR Comments at 13-15 [J.A.076-078]; 49 C.F.R. § 1111.9 (detailing requirements of "Second Disclosure").

SAC cases due to the STB's road property investment changes warranted an increase to the Three Benchmark relief cap. *See NPRM* at 15 [J.A.066]. Railroad commenters objected to the increase, noting the agency's repeated recognition of the "roughness" and "imprecision" of the Three Benchmark method and the fact that such an increase would mean that the Three Benchmark methodology would apply to the vast majority of regulated traffic.[13] Commenters also pointed out that such an increase could create a "ratcheting" effect whereby the repeated use of the Three Benchmark averaging approach could artificially force rates down.[14] Shippers, on the other hand, asked for the relief limits to be increased even more than the Board proposed in the *NPRM*.[15] After receiving comments, the STB agreed with shippers and quadrupled the relief cap to $4 million. *See Decision* at 22-25 [J.A.032-035]. As explained below, this decision makes over two-thirds of all regulated traffic potentially eligible for this crude, rough, and imprecise methodology. *See infra* at 28 & n.32.

    *Third*, the STB proposed to amend the ATC rule for allocating cross-over traffic revenues in SAC and Simplified-SAC cases. Cross-over traffic is a hypothetical construct whereby a complainant posits that movements it has

---

[13] *See, e.g.*, CSXT/NS Comments at 24-25 [J.A.125-26].

[14] *Id.* at 23 [J.A.124].

[15] *See, e.g.*, Opening Comments of "Joint Chemical Companies" at 27 (Oct. 23, 2012) ("Chemical Shippers Comments") [J.A.090].

selected would be routed over lines of the SARR for only a portion of their real-world route of movement.  *See NPRM* at 6-7 [J.A.057-058]; *Major Issues* at 24. Using this device, the complainant assumes that "the SARR would not replicate all of the defendant railroad's service, but would instead interchange the traffic with the residual portion of that railroad's system." *Id.*  Because cross-over traffic moves both on the SARR and on the residual incumbent, it is necessary to allocate the revenues associated with this traffic between the two carriers.[16]  Under the ATC methodology adopted in *Major Issues*, all cross-over revenues are allocated between the on-SARR and off-SARR segments in proportion to their relative average total costs.

In Ex Parte 715, the STB proposed to change the allocation methodology by adding a second step that would reallocate revenues to ensure that the revenues allocated to each segment were at least equal to the defendant carrier's URCS variable costs for that segment.  *See NPRM* at 17-18 [J.A.068-069].  The STB deemed any allocation of revenues lower than the defendant's URCS system average variable costs for a segment to be "illogical" and "implausible," and

---

[16] By way of further explanation, consider a SARR that follows the footprint of I-95 between Baltimore and Richmond.  The shipper can posit that traffic originating on I-70 in Columbus and "crossing-over" to I-95 before terminating in Richmond would be handled by the SARR and that the SARR deserves a share of the revenue for that traffic.  Revenue allocation determines the proper division of revenue for the Columbus to Richmond traffic between the I-95 segment (the SARR segment) and the I-70 segment (the off-SARR segment).

13

proposed the new method to re-allocate revenues where necessary "to avoid allocating revenues below URCS variable costs." *See id.* at 7-8, 17-18 [J.A.058-059, 068-069].[17]

Railroad commenters opposed the proposed rule change as unnecessary and inconsistent with the guiding principle of ATC—that cross-over revenues should be allocated to reflect economies of density. *See* Joint Reply Comments of CSXT & NS at 23 (Dec. 7, 2012) ("CSXT/NS Reply") [J.A.169]; AAR Comments at 20-21 [J.A.081-082]. Railroads explained that there is no logical reason to insist that revenues generated by the optimally efficient SARR for a particular movement must meet or exceed URCS costs for the less-efficient real world railroad for the same segment. The railroads further argued that occasional allocation of revenues at levels below the defendant's URCS variable costs for a segment of a movement is the logical result of applying ATC to low-rated movements that a complainant may elect to include in its SARR traffic group. In a related argument, CSXT and NS also proposed that the STB use the *SARR*'s costs—rather than the defendant

---

[17] The STB previously raised this concern, *sua sponte,* in the context of an individual adjudication, in which it created and applied a different amended methodology ("Modified ATC"). *See Western Fuels Ass'n v. BNSF Ry. Co.,* STB Docket No. NOR 42088 (Sept. 10, 2007). After appeal this Court remanded the STB's application of Modified ATC. *See BNSF Ry. Co. v. STB,* 604 F.3d 602, 613 (D.C. Cir. 2010). On remand, the STB reapplied Modified ATC, and an appeal of that decision is pending. *See BNSF Ry. Co. v. STB,* D.C. Cir. No. 12-1327.

14

carrier's costs—to calculate SARR average total cost for purposes of allocating cross-over revenues using ATC. *See* CSXT/NS Comments at 17-18 [J.A.118-119].

The final rule adopted the new methodology without modification. *See Decision* at 28-34 [J.A.038-044]. The *Decision* devoted several pages to evaluation of shipper comments proposing other alternative revenue allocation methods. However, the STB did not address any of the comments that demonstrated that the STB's premise for the rule change—that any revenue allocation below the defendant's URCS variable costs would be inconsistent with a cost-based revenue allocation methodology—was wrong.

*Fourth*, the agency proposed to change the interest rate on reparations from the rate for 90-day U.S. Treasury Bills to the U.S. Prime Rate. *See NPRM* at 18 [J.A.069]. While several commenters objected to that proposal and noted that the *NPRM* wrongly stated that the U.S. Prime Rate was a "market interest rate" and one "that the banks charge to their most creditworthy customers," *id.*,[18] the *Decision* adopted the proposed new rule. *See Decision* at 35-36 [J.A.045-046].

## SUMMARY OF ARGUMENT

The *Decision* violates the ICA and the APA in four ways.

*First*, the STB's decision to eliminate the relief cap for Simplified-SAC cases directly violates 49 U.S.C. § 10701(d)(3) of the ICA, which limits

---

[18] *See, e.g.*, CSXT/NS Reply at 32-34 [J.A.174-76].

"simplified" methods to "those cases in which a full stand-alone cost presentation is too costly, given the value of the case." The STB does not have discretion to disregard the express language of a statute that reflects Congress's unambiguous approval of the SAC test and intent that simplified methods only be used in cases too small to justify a SAC analysis.

The STB's attempt to interpret the ICA to give itself authority to prescribe simplified methods for cases regardless of value fails because it would render § 10701(d)(3) meaningless surplusage. Similarly, the agency's claim that Congress would have approved unlimited use of Simplified-SAC fails both legally and factually. What counts is what Congress said in the statute, not agency speculation about what Congress would have thought about an allegedly "robust" new method. And the agency's assertion that Simplified-SAC is as "robust" as SAC for measuring cross-subsidies is simply not supported by the record.

*Second*, the STB's increase of the relief cap for Three Benchmark cases was predicated on a serious miscalculation of the cost of a Simplified-SAC case. The STB first erred by accepting an inherently non-credible cost estimate from a litigant who asserted that its last, limited rebuttal filing would have cost 60% more than its entire expenses for discovery and preparing its case-in-chief. The STB compounded its mistake with a basic mathematical error: namely, the STB attempted to factor the cost of an expanded road property investment presentation

16

into its estimate of Simplified-SAC costs by adding an estimate of the full costs of such a presentation to an estimate that already included many of the costs of this presentation.  The resulting double-count of road property investment expenses is a clear error.

*Third*, the STB entirely failed to respond to important comments on its proposed amendment to its ATC cross-over revenue allocation rule.  These failures render the STB's adoption of that amended rule arbitrary and capricious.

*Fourth*, the *Decision*'s adoption of a new interest rate for reparations violated the APA because the agency failed to address comments that questioned two of its key premises for making the change.  Commenters presented evidence that directly contradicted the agency's assertions that the U.S. Prime rate was a market interest rate and the rate banks charge to their most creditworthy customers. The STB failed to address or even acknowledge that evidence.

Each of these portions of the *Decision* should be vacated.

## STANDING

Petitioners are common carriers by railroad who are each defendants in rate reasonableness cases currently pending before the STB and who expect to be defendants in future rate reasonableness cases.  The Decision revised the STB's procedures for rate reasonableness cases in a manner that is arbitrary, capricious,

17

and contrary to law and that will adversely affect Petitioners.  Both Petitioners

participated in the rulemaking resulting in the *Decision* under review.

## ARGUMENT

I.   **THE STB'S DECISION TO REMOVE THE RELIEF CAP ON SIMPLIFIED-SAC CASES VIOLATES THE INTERSTATE COMMERCE ACT.**

The STB violated the unambiguous language of 49 U.S.C. § 10701(d)(3)

when it removed the relief cap for Simplified-SAC cases.  Simply put, the STB's

decision to allow a simplified methodology to be used for any case of any value—

even one with hundreds of millions of dollars at stake[19]—violates Congress's

command that simplified methods be used only when a "full stand-alone cost

presentation is too costly, given the value of the case."  Congress's intent in

§ 10701(d)(3) was clear, and the STB is bound by that plain language.  *See*

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984); *Int'l Union, United*

*Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 90 (D.C. Cir.

2010).

Less economically sound tests are available only "in those cases in which a

full stand-alone cost presentation is too costly, given the value of the case." 49

U.S.C. § 10701(d)(3).  By making clear that the STB should only use simplified

---

[19] *Cf. Western Fuels Ass'n, Inc. v. BNSF Ry. Co.*, STB Docket No. NOR 42088, slip op. at 2 (Feb. 17, 2009) (granting shipper estimated relief of $345 million), *appeal pending*, D.C. Cir. No. 12-1327.

18

methods when "the value of the case" made a full-SAC analysis impractical, Congress ratified the full SAC test as the preferred method for determining the reasonableness of rail rates.  The statute thus requires the applicability of any simplified method to be guided by three factors:  (1) the cost of presenting a full SAC case; (2) the value of the case to which the simplified and expedited method would be applied; and (3) the relationship between factors (1) and (2).  *See id.*  The *Decision* violates the statute because it allows a simplified method to be used to seek unlimited relief in every case without consideration of these statutorily mandated factors.  Congress's choice of the clause "in those cases in which a full stand-alone presentation is too costly" necessarily presumes the existence of some cases for which a full stand-alone presentation is not too costly.  The statute thus makes clear that some cases cannot be eligible for any simplified method.  The STB's decision to remove relief caps for Simplified-SAC reads that limiting provision out of the statute.

Before the *Decision*, both the STB and this Court had read the ICA to limit the use of simplified procedures to cases whose relatively low value made SAC impractical.  *Simplified Guidelines* held that "simplified procedures must be used as sparingly as possible, reserved for only those cases where CMP is not a realistic option."  *Simplified Guidelines*, 1 S.T.B. at 1021.  In the same vein, in *Simplified Standards* the STB reaffirmed that the purpose of simplified procedures is to

19

"provide shippers meaningful access to regulatory relief in those cases where a Full-SAC case is too costly, given the value of the case." *Simplified Standards* at 34.  The STB further recognized that Congress wanted the STB to use more accurate methodologies where such methodologies were cost-effective. *See id.* at 53 ("We do not believe that Congress would have wanted the STB to reject a methodology with a solid economic foundation in favor of a cruder approach less well grounded in economic principles.").

This Court's review of *Simplified Standards* similarly read § 10701(d)(3) to require simplified methodologies to be used for "low value cases":

> [S]ection 10701(d)(3)'s requirement of a "simplified and expedited method for determining the reasonableness of challenged rail rates in those cases in which a full stand-alone cost presentation is too costly, given the value of the case," clearly contemplates a method that may substitute for a full SAC proceeding in <u>low value cases</u>.

*CSX Transp.*, 568 F.3d at 242 (emphasis added).  The *Decision* thus violates the plain, unambiguous language of the statute and departs from both the agency's and this Court's prior applications of that plain language.  Because the agency has adopted an incorrect interpretation of an unambiguous statute, its interpretation fails under the first step of the familiar *Chevron* test.  *Chevron*, 467 U.S. at 842-43.[20]

---

[20] Even if § 10701(d)(3) were ambiguous (and it is not), the STB's interpretation would fail under *Chevron* Step Two because it unreasonably interprets

The STB offered two justifications for its changed position in the *Decision*. First, the STB argued that § 10701(d)(3) does not limit its discretion to allow simplified methods to be used in place of SAC regardless of case value. *Decision* at 16 [J.A.026]. According to the agency, § 10701(d)(3)'s directive that the STB create simplified methods for cases "in which a full stand-alone cost presentation is too costly, given the value of the case" only requires it to create simplified methodologies for those low-value cases and does not prevent it from using the simplified methodologies for high-value cases as well. In the STB's view, to reason otherwise would be to commit the logical fallacy of "denying the antecedent." *Id.* at 16-17 [J.A.026-027].

But it is the STB that commits the fallacy of reading the statute in a way that renders a key provision meaningless surplusage. If the STB were right that the only meaning of § 10701(d)(3) is to require the STB to create simplified procedures that it is free to apply to any case, then the statutory direction that the simplified procedures be applied "in those cases in which a full stand-alone cost presentation is too costly, given the value of the case" would have no effect. "[A]ll words in a statute are to be assigned meaning, and . . . nothing therein is to be construed as surplusage." *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638,

§ 10701(d)(3) in a way that makes part of the statute superfluous, as explained below.

644 (D.C. Cir. 2000).[21]   A statutory interpretation that renders key portions of the

statute superfluous cannot stand.[22]

     The STB's "denying the antecedent" rationale boils down to a claim that it

has found a logical loophole in § 10701(d)(3) that allows it to ignore the plain

import of Congress's language that simplified methodologies be used only when

necessary "given the value of the case."  But the "denying the antecedent" concept

that the agency borrows from formal logic has almost never been invoked to guide

statutory interpretation.[23]   That may be because the STB's "denying the

antecedent" position that no inferences can be drawn from Congress's specification

---

[21] *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("'[A] statute ought, upon the
whole, to be so construed that, if it can be prevented, no clause, sentence, or word
shall be superfluous, void, or insignificant.'"); *Bowsher v. Merck & Co.*, 460 U.S.
824, 833 (1983) (applying the "settled principle of statutory construction that we
must give effect, if possible, to every word of the statute").

[22] There is no merit to the STB's suggestion that recognizing that § 10701(d)(3)
requires "the value of the case" to be considered before applying simplified
methodologies would somehow preclude the STB from adopting more than one
simplified methodology.  *Decision* at 17 [J.A.027].  Nothing in the statute either
mandated or precluded the agency from creating the Three Benchmark approach as
a second "simplified and expedited method," so long as it did so "nonarbitrarily."
*CSX Transp., Inc.*, 568 F.3d at 244.  In contrast, the statute clearly requires that
"the value of the case" be considered before permitting simplified methodologies,
and there is no nonarbitrary way for the agency to ignore that command.  *Id.*

[23] In the few published cases where "denying the antecedent" has been invoked, the
concept is typically used as an interpretive tool for judicial or contractual language.
*See, e.g.*, *New England Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 370
(D.C. Cir. 2013) (interpreting *Mobile-Sierra* doctrine); *Agri Processor Co. v.
NLRB*, 514 F.3d 1, 6 (D.C. Cir. 2008) (citing principle when interpreting language
from Supreme Court decision).

22

that simplified procedures be made available for low-value cases is irreconcilable with the basic canon of construction *expressio unius est exclusio alterius*, *i.e.*, "'that to express or include one thing implies the exclusion of the other, or of the alternative.'"  *Echostar Satellite, LLC v. FCC*, 704 F.3d 992, 999 n.5 (D.C. Cir. 2013) (quoting *Black's Law Dictionary* 661 (9th ed. 2009)).

Simply put, *expressio unius* is the principle that Congress's decision to include some categories in a statute implies that it intended to exclude other categories.  Here, Congress's decision to order the STB to create simplified procedures for "those cases in which a full stand-alone cost presentation is too costly, given the value of the case"—and its exclusion of cases where a full-SAC presentation is not too costly—creates an inference that the exclusion was intentional.  That inference is particularly strong here both because failure to draw that logical inference would lead to a surplusage[24] and because of Congress's stated purpose to provide regulatory access for low-value cases without "erod[ing] the Constrained Market Pricing principles adopted by the ICC for full stand-alone cost presentations."  S. REP. No. 104-176, at 8.

The STB's second rationale for removing relief caps for Simplified-SAC cases was its speculation that Congress would not have wanted to limit Simplified-

---

[24] *See Indep. Ins. Agents*, 211 F.3d at 645 ("the [canons] of avoiding surplusage and *expressio unius* are at their zenith when they apply in tandem"); *see also Beverly Health & Rehab. Servs., Inc. v. NLRB*, 317 F.3d 316, 321 (D.C. Cir. 2003).

SAC because the method is sufficiently "robust." *Decision* at 17 [J.A.027]. This reasoning is meritless. Because the statutory language is clear, the STB must apply the statute, not resort to speculation about why Congress might not have meant what it said.[25] Indeed, because the ICC was considering a Simplified-SAC option at the time Congress limited the application of simplified methodologies based on the cost of a "full-stand-alone cost presentation," it is particularly unreasonable to think that Congress would have approved of substituting Simplified-SAC for full-SAC without considering the value of the case. *See supra* at 6.

Moreover, the STB's claim that Simplified-SAC is sufficiently "robust" to be as reliable as SAC for identifying cross-subsidies is not accurate. *Decision* at 17 [J.A.027]. After all, Simplified-SAC continues to be—by definition—a simplification of SAC. Perhaps the most significant "simplification" of the Simplified-SAC methodology is for SARR operating expenses. In a SAC case, the parties develop SARR-specific operating costs for the specific traffic group at issue. In contrast, Simplified-SAC simply employs URCS, which uses a railroad's financial reports and annual operating statistics for all traffic to estimate that railroad's average variable costs of providing service. As the STB has recognized, "a carrier's system-wide average costs are not necessarily representative of the

---

[25] *See Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) ("An agency may not disregard the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy.") (internal quotation marks omitted).

costs of providing a particular service." *Public Serv. Co. of Colo. d/b/a Xcel Energy v. Burlington Northern & Santa Fe Ry. Co.*, STB Docket No. NOR 42057, at 122 (June 7, 2004).

Like any average, URCS "spreads" unique costs attributable to some higher-cost movements across all movements on a railroad's network. A good example is the transportation of chlorine and other toxic-by-inhalation ("TIH") chemicals, which generates additional insurance, liability, handling, and regulatory compliance costs that the current URCS system does not allocate to those shipments.[26]

URCS therefore could not reliably estimate operating costs for a SARR with a significant percentage of high-cost movements, such as a SARR whose traffic group includes a large number of TIH movements.[27] And even for more conventional cases, the distinction between Simplified-SAC URCS average costs and SAC actual operating costs often could be significant, particularly in major

---

[26] A STB proceeding on ways to adjust URCS to better account for TIH transportation costs has been pending for nearly five years. *See Class I Railroad Accounting and Fin. Reporting – Transp. of Hazardous Materials*, STB Ex Parte No. 681 (Jan. 5, 2009).

[27] This is not a hypothetical concern. Just such a SARR was proposed in the pending SAC case *Sunbelt Chlor Alkali P'ship v. Norfolk Southern Railway Co.*, STB Docket No. NOR 42130. While much of the SAC evidence in that case addressed the parties' disputes about how to account for the SARR's costs of handling TIH traffic, if *Sunbelt* were a Simplified-SAC case the STB would ignore all those additional costs in favor of the system-average URCS costs.

cases worth tens or hundreds of millions of dollars.  Changes to estimated SARR

operating expenses can have a significant impact on SARR profitability and thus

on determination of the maximum reasonable rate.  In short, the record does not

support the agency's assertion that Simplified-SAC is "robust" enough that

Congress would not have minded it being used in even the largest rate cases.[28]

In addition to violating § 10701(d)(3), the STB's decision violates APA

standards because it fails to provide a reasoned analysis that justifies substituting a

less rigorous methodology for the economically sound and well-established SAC

test in high-value cases.  In *Burlington Northern*, this Court admonished that any

attempt to substitute a simplified methodology for CMP and SAC would require "a

careful analysis indicating that the incremental costs of applying CMP/SAC are

large in relation to the attendant sacrifice in quality."  985 F.2d at 599.  The STB

did not engage in such a "careful analysis" here.  On the contrary, it simply

asserted that railroads had no basis for thinking that using system average costs to

estimate operating expenses would be less accurate than SAC-style operating

expense calculations—even though the agency itself has long recognized the

inherent inaccuracy of URCS averages.  *See Decision* at 17 [J.A.027]; *Xcel* at 77.

---

[28] It is no answer for the STB to say that URCS costs are also used for some other
purposes in SAC cases.  *See Decision* at 17 [J.A.027].  In SAC cases URCS is used
for relatively limited purposes—primarily cross-over revenue allocation and rate
prescription calculations—and it plays no role in calculating SARR operating
expenses.  But in Simplified-SAC cases <u>all</u> SARR operating expenses are
calculated from URCS averages.

In short, the *Decision* authorizes the use of a "simplified" and "expedited" methodology regardless of the cost of a full-SAC presentation or the value of the case. Thus, it violates the express language of § 10701(d)(3), and that part of the *Decision* must be vacated.

## II.    THE STB'S DECISION TO INCREASE THE MAXIMUM RELIEF CAP FOR THREE BENCHMARK CASES TO $4 MILLION WAS ARBITRARY AND CAPRICIOUS.

The STB's decision to quadruple the relief limit for Three Benchmark cases is a dramatic departure from its past recognition that Three Benchmark should be confined to the very smallest cases. Before the *Decision*, the STB did not mince words when describing the flaws of the Three Benchmark approach. The STB called it "crude,"[29] "imperfect,"[30] and "very rough and imprecise."[31] This Court, too, has recognized that Three Benchmark results "more often than not will be the antithesis of mathematical certainty." *Union Pac. R.R. v. STB*, 628 F.3d 597, 607 (D.C. Cir. 2010). Three Benchmark does not even have a tenuous relationship to CMP or any other sound economic foundation.

Because of these flaws, the approach was "reserved for use only as a last resort, once we have exhausted reasonable measures to simplify the SAC analysis."

---

[29] *Simplified Standards* at 73.

[30] *Simplified Standards for Rail Rate Cases*, STB Ex Parte No. 646 (Sub-No. 1), at 28 (July 26, 2006) ("*Simplified Standards NPRM*").

[31] *Simplified Standards* at 73.

27

*Simplified Standards NPRM* at 11.  The agency originally proposed limiting the

Three Benchmark approach to cases with a value under $200,000, *id.* at 33-34; in

response to comments from shippers, the relief limit was raised to $1 million.

*Simplified Standards* at 28-29.  The STB based the Three Benchmark relief limit

on shipper claims (with some STB adjustments) that prosecuting a Simplified-SAC

case would cost a complainant approximately $1 million in attorney and consultant

fees.  *Id.* at 92-93.

The *Decision* quadrupled this relief limit, thus transforming Three

Benchmark from a last-resort methodology for shippers with no regulatory option

into an avenue available for a substantial majority of regulated traffic.  The STB's

decision to raise the relief cap for Three Benchmark cases is arbitrary and

capricious for two independent reasons.  *First*, the agency's stated rationale for the

increase was predicated on an insufficient and incomplete factual record and

simple mathematical errors.  *Second*, the STB's dramatic expansion of Three

Benchmark makes this crude rate comparison approach applicable to over two-

thirds of all regulated traffic,[32] and thus eviscerates what had been the STB's key

rationale for retaining this approach despite its theoretical flaws.  As this Court has

recognized, repeated application of a rate averaging method like Three Benchmark

---

[32] In the *Simplified Standards NPRM*, the STB estimated that 67% of all traffic
subject to its jurisdiction would have a maximum rate case value of less than
$3.5 million over five years.  *Simplified Standards NPRM* at 37.

could cause an artificial "ratcheting" effect depressing rates. While the STB held in *Simplified Standards* that Three Benchmark was acceptable despite this risk because it was a limited remedy for small cases, the *Decision* negates that reasoning by transforming Three Benchmark into a mainstream remedy applicable to multimillion dollar cases. The agency failed to provide a reasoned justification for this change in course or an adequate explanation for making a crude averaging methodology applicable to over two-thirds of regulated traffic. For all these reasons, this part of the *Decision* must be vacated.

### A.    The STB's Rationale For Increasing the Three Benchmark Relief Cap Was Based on Flawed Evidence and Incorrect Calculations.

The STB's primary rationale for its decision to increase Three Benchmark relief limits is that it had no choice but to do so in light of its revised estimate that the litigation costs of a Simplified-SAC presentation were $4 million. *See Decision* at 24 [J.A.034]. The STB's decision thus must stand or fall on this stated rationale. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*¸ 463 U.S. 29, 50 (1983) ("an agency's action must be upheld, if at all, on the basis articulated by the agency itself"). But that $4 million estimate is predicated on obviously exaggerated testimony, egregious mathematical errors, and unsupported assertions by the very parties seeking to raise the Three Benchmark relief cap.

The STB made three critical errors that compounded to create a litigation cost estimate that is not supported by substantial evidence. *First*, the STB accepted

29

an unsupported and illogical claim by U.S. Magnesium, LLC ("USM"), a complainant in a Simplified-SAC case that settled, that its litigation costs "could have reached . . . $2 million." *See Decision* at 22-23 [J.A.032-033]. From that speculation alone, the STB concluded that its *Simplified Standards* analysis of litigation costs was too low, and that USM's $2 million estimate should be the starting point for calculating Simplified-SAC litigation costs after implementation of the *Decision*'s road property investment changes. *See id.* at 23 [J.A.033].

The record showed that USM's math simply did not add up. USM testified that it spent $750,000 on discovery and on preparation of its opening evidence and asserted that "legal and expert costs for opening, rebuttal and reply evidence . . . could have reached approximately $2 million." Opening Comments of USM, Verified Statement of Howard Kaplan at 6 (Oct. 23, 2012) ("USM Opening Comments") [J.A.148]. The idea that after spending $750,000 on discovery and opening evidence, "rebuttal and reply evidence" would cost an additional $1,250,000 is inherently incredible. *See* Reply Comments of Ass'n of Am. Railroads at 17 (Dec. 7, 2012) ("AAR Reply") [J.A.160]. In the first place, USM would not have any reply evidence to file. Simplified-SAC cases proceed under the same basic evidentiary framework as full SAC cases. The complainant files opening evidence that is to contain its full case-in-chief; the defendant files reply evidence; and the complainant closes with rebuttal evidence. Moreover, under

30

STB rules a complainant's full case in chief must be included in its opening evidence; rebuttal evidence is to be limited (and thus logically less costly than opening evidence).[33]  It therefore is not surprising that a Simplified-SAC litigant would expend much of its litigation budget preparing opening evidence.  As commenters pointed out, USM's claim to have spent $750,000 to develop its case in discovery and prepare its case-in-chief does not suggest that the *Simplified Standards* estimate is too low—rather it suggests that the STB's $1 million estimate was quite close to the target.  *See* AAR Reply at 17 [J.A.160].  The Board did not address these comments and instead uncritically accepted USM's speculative, unsupported, and self-serving $2 million estimate.

*Second*, the STB amplified its mistaken acceptance of USM's $2 million cost estimate by making a fundamental mathematical error.  In an effort to reflect the *Decision*'s changes to road property investment evidence, the STB added the claimed cost of full road property investment evidence to USM's alleged litigation cost estimate <u>without subtracting the cost of developing road property investment evidence under the prior regime</u>.  *Decision* at 23 [J.A.033].

---

[33] *See M&G Polymers USA, LLC v. CSX Transp., Inc.*, STB Docket No. NOR 42123, at 9 (Sept. 27, 2012) ("Board rules clearly direct complainants to put forth their best and most complete case on opening"); *Duke Energy Corp. v. Norfolk Southern Ry. Co.*, 7 S.T.B. 89, 101 (2003) (setting forth rules limiting scope of permissible rebuttal).

Although *Simplified Standards* sought to streamline road property investment calculations where possible, Simplified-SAC complainants were still required to prepare part of the road property investment analysis required in SAC cases. *See Simplified Standards* at 38-48.[34]  There is no question that the USM Simplified-SAC cost estimate included substantial road property investment costs; indeed, USM cited "the complex nature of the replacement cost railroad property calculations" as a primary component of its litigation costs.  USM Opening Comments, V.S. Kaplan at 6 [J.A.148].  Because the STB did not subtract the expenses required to do this partial road property analysis from the estimated cost of a full road property analysis before adding it to USM's Simplified-SAC cost estimate, the *Decision* double-counted expenses and created an inflated estimate of the true cost of litigating a Simplified-SAC case.  This double-counting is textbook arbitrary and capricious reasoning and an obvious error.  *See Alabama Power Co. v. FCC*, 773 F.2d 362, 372 (D.C. Cir. 1985) (errors in agency's "somewhat casual calculations" rendered decision arbitrary and capricious).

*Third*, the STB's estimate of litigation costs for a full road property investment presentation was unreliable at best.  The "estimate" that the STB relied

---

[34] For this reason, the largest line item in the *Simplified Standards* testimony that the STB used to develop its Simplified-SAC litigation cost estimate was "Develop Road Property Investment for identified SARR."  CSXT/NS Opening at 26 [J.A.127] (citing *Simplified Standards* record that estimated up to 600 consultant hours for this item).

32

upon was supported by no time estimates or specific calculations.  *See* Chemical

Shippers Comments, Verified Statement of Thomas Crowley and Robert

Mulholland at 60 [J.A.094]; CSXT/NS Reply at 27 [J.A.173] (pointing out lack of

support for estimate).  Moreover, it was an estimate of the costs incurred when

developing "larger, more complex SARR systems"—a qualification that the STB

ignored when using the estimate as a baseline for all cases.  *Id.*

The STB's attempt to excuse its reliance on unsupported evidence by

blaming railroads for not submitting their own estimate of litigation costs is

unavailing.  "[R]ational decisionmaking . . . requires more than an absence of

contrary evidence; it requires substantial evidence to support a decision."

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 767 (D.C.

Cir. 2009).

In short, the STB's uncritical acceptance of unsupported shipper claims of

litigation costs in the face of evidence that those claims were exaggerated was

arbitrary and not founded on substantial evidence.  *Cf. Texas Office of Pub. Util.*

*Counsel v. FCC*, 265 F.3d 313, 328 (5th Cir. 2001) ("An agency abdicates its role

as a rational decision-maker if it does not exercise its own judgment, and instead

cedes near-total deference to private parties' estimates").

### B.   The STB Failed to Address How Its Increase of the Three Benchmark Relief Cap Undermined Its Rationale for Using Such A Flawed Approach.

Moreover, the STB's decision was arbitrary and capricious because it failed to address how making two-thirds of regulated traffic eligible to use Three Benchmark undermines the STB's basic justification for retaining that flawed rate comparison approach. One of the reasons that the STB originally limited Three Benchmark to the smallest cases is that any attempt to use rate comparisons to judge rate reasonableness suffers from a fundamental methodological flaw. *Simplified Standards* at 73-74. Specifically, if the agency uses an average of other rates to determine that a rate is "unreasonably high" and then prescribes a lower rate, that action lowers the average. In the next case, the lower average will result in an even lower rate prescription, and so on until the "average" measure of reasonableness approaches the 180% R/VC threshold below which the agency may not regulate.[35] This Court previously rejected an ICC attempt to use a rate comparison formula as a simplified alternative to SAC precisely because its reliance on R/VC averages had the potential to ratchet down rates. *See Burlington Northern R.R. Co.*, 985 F.2d at 597.

Before the *Decision*, the STB admitted that Three Benchmark suffers from the same fundamental theoretical flaw that concerned the *Burlington Northern*

---

[35] *See* 49 U.S.C. § 10707(d)(1)(A).

court, but argued that concern about ratcheting down rates was alleviated by the Three Benchmark relief cap. *See Simplified Standards* at 73-74 ("the potential for ratcheting will be severely constrained by the limit on the relief available under this approach"). Raising the relief limits to $4 million eviscerates this rationale, and fosters the downward rate "ratcheting" problem identified in *Burlington Northern.*

With its argument that a tight relief cap would limit "ratcheting" largely mooted by its substantial increase to that cap, the STB fell back on an argument that it would take an "avalanche of rate cases" for ratcheting to occur. *Decision* at 24 [J.A.034]. The STB offers no evidentiary support for this conclusory assertion, and there is none in the record. Moreover, *Burlington Northern* rejected a near-identical claim that multiple rate cases would be required for ratcheting to occur, holding that "[t]his practical defense . . . does nothing to give R/VC any glimmer of supporting principle or intellectual coherence." *Burlington Northern R.R. Co.*, 985 F.2d at 597.

In short, the litigation cost estimate that was the sole basis for increasing the Three Benchmark relief cap was irreparably flawed, and the STB could not rationally rely on it. And the STB's reliance on this flawed evidence is all the more unreasonable because it expands an admittedly flawed approach to a vast

35

swath of traffic and creates a real risk of the same downward ratcheting of rail rates that led this court to vacate the agency's decision in *Burlington Northern*.

## III.  THE STB'S NEW CROSS-OVER TRAFFIC REVENUE ALLOCATION RULE IS ARBITRARY AND CAPRICIOUS.

The new cross-over traffic revenue allocation rule adopted by the *Decision* is arbitrary and capricious because the STB failed to respond to comments demonstrating that the STB's foundational premise for proposing to change the cross-over traffic revenue allocation methodology is erroneous and unexplained, and provides no rational basis for changing the methodology adopted in *Major Issues* and affirmed by this Court.  By failing to address these comments, the STB "entirely failed to consider [] important aspect[s] of the problem" of cross-over traffic revenue allocation and failed to "cogently explain" its action or show that it "was the product of reasoned decisionmaking." *See State Farm¸* 463 U.S. at 43, 48, 52; *AEP Texas North Co. v. STB*, 609 F.3d 432, 438 (D.C. Cir. 2010); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin*, 494 F.3d 188, 203 (D.C. Cir. 2007).  The STB's failure to respond to significant comments regarding an important aspect of the alleged problem it had identified renders its new cross-over traffic rules arbitrary and capricious.  *See State Farm¸* 463 U.S. at 43*; Ass'n of Private Sector Colleges and Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012).

36

A.    **The ATC Rule, the STB's Proposed Amendment, and Comments Questioning the Premise of the Proposal.**

The STB adopted the Average Total Cost ("ATC") "cross-over traffic" revenue allocation methodology in the *Major Issues* rulemaking.  ATC allocates revenues generated by cross-over traffic to the SARR and to the residual incumbent (the defendant carrier) "in proportion to the average total cost of the movement on- and off-SARR."  *NPRM* at 7 [J.A.058].

The STB adopted ATC in order to properly account for economies of scale, scope, and density, which it described as "the defining characteristic of the railroad industry."  *Major Issues* at 25.  Methods for allocating cross-over traffic revenue that the STB had previously used failed to account for economies of density.  *See id.* at 24-26, 33-34.  Because ATC allocates cross-over revenues based on average total cost per ton (average variable cost per ton + average fixed cost per ton), it achieves the twin objectives of accounting for economies of density and diminishing returns.  *Id.* at 34 (*citing BNSF Ry. Co. v. STB*, 453 F.3d 473, 484 (D.C. Cir. 2006) in support of its decision to adopt methodology that accounts for these two factors).  On appeal, this Court upheld the STB's ATC revenue allocation rule, noting that ATC "takes account of both economies of density and diminishing returns." *BNSF Ry. Co. v. STB*, 526 F.3d 770, 783 (D.C. Cir. 2008) (internal quotation marks omitted).

37

In Ex Parte 715, the STB proposed to amend the ATC rule in a manner that would dilute the methodology's most important feature (accounting for economies of density), based solely on the STB's concern that in some limited instances application of ATC could result in allocation of revenues that would not cover the on-SARR segment's variable costs.  Importantly, the variable cost measure the Board used for this comparison was <u>not</u> the optimally efficient SARR's variable costs, but rather the real-world defendant carrier's URCS system average costs. *See NPRM* at 8, 17-18 [J.A.059, 068-069].  Without further explanation or discussion, the STB labeled such an allocation "illogical" and "implausible." *See id.*

To address this perceived "problem," the STB proposed to abandon the full ATC approach for some low-rated cross-over movements.  *See NPRM* at 8-9, 17-18  [J.A.059-060, 068-069] (describing proposed "Alternative ATC" allocation method).[36]  In order to avoid allocating revenue to a segment that would fall below the defendant's URCS variable costs for that segment, the proposed Alternative ATC rule would reallocate revenue to segments whose ATC revenue allocation would not cover their variable costs (as measured by the defendant's URCS system

---

[36] Throughout this Brief, references to ATC shall mean the Average Total Cost cross-over revenue allocation methodology and rule adopted in *Major Issues* and <u>not</u> the so-called "Modified ATC" that the STB applied *sua sponte* in the context of a single rate adjudication (*Western Fuels*), or the "Alternative ATC" the STB proposed and adopted in the rulemaking under review.

average variable costs).[37]  *See NPRM* at 17-18 [J.A.068-069].  The STB posited that such a methodology would avoid "creat[ing] the implausible result of driving the revenue allocation on any segment below variable costs."  *Id.*  An inevitable consequence of this new proposed rule would be to diminish the role of economies of density—a "defining characteristic of the railroad industry"—in allocating cross-over traffic revenues.

The STB offered no meaningful explanation of the premise for its proposed change to the ATC rule.  Instead, it simply asserted that the fact that the ATC rule may in some instances allocate an amount of revenues to a segment of a cross-over movement that is lower than the defendant's URCS variable costs for that segment was somehow "illogical" and therefore required amendment of the ATC methodology to eliminate the possibility of such a result.  *See NPRM* at 8, 17 [J.A.059, 068].[38]  The NPRM then announced that accounting for economies of density and avoiding revenue allocations below the defendant's variable costs were

---

[37] This summary of Alternative ATC is simplified.  *See NPRM* at 17-18  [J.A.068-069] (fuller description of the multi-step amended methodology).

[38] The Board also noted that a revenue allocation that does not exceed variable costs of a segment of a movement means the movement does not contribute to the joint and common costs on that segment.  *See NPRM* at 8.  But this is simply another way of saying that the revenue allocation does not cover the movement's variable costs for the segment.  The measure of variable costs that the Board used was the defendant carrier's URCS costs, not the relevant variable costs of the optimally efficient SARR.

"two competing principles" that it sought to accommodate in its proposed new rule. *Id.* at 18 [J.A.069].[39]

In adopting ATC to account for economies of density in allocating cross-over revenues, the STB had explained that the method was "unbiased because it allocates costs in relation to the average total costs of providing service over the parts of the network in question." *Major Issues* at 36 n.92. In proposing to amend the ATC rule, the STB offered no meaningful rationale for abandoning that approach and its logic in instances where the resulting revenue allocation to an artificial segment of a movement would be lower than the portion of a defendant's variable costs assigned to that segment. Nor did the agency proffer any rationale for injecting bias in those instances.

> **1.    Commenters Demonstrated That The Revenue Allocation Scenario That Concerned The STB Was Consistent With The Principles Underlying ATC, Logical, And Provided No Basis for Departure from Revenue Allocations Fully Based on Relative Average Total Costs.**

In response to the *NPRM* and the absence of explanation of the notion that revenue allocations below the defendant carrier's variable cost was "illogical," several parties submitted comments showing that the STB's proposed rule

---

[39] The STB failed to explain <u>why</u> it believed occasional allocation of revenues to a cross-over segment that are lower than the defendant's URCS variable costs for that segment was illogical, or why that perceived problem was sufficiently significant to warrant a change to the ATC rule that would undermine its primary purpose: allocating cross-over revenues to account for economies of density.

proceeded from an erroneous premise, sought to address a problem that did not exist, and would undermine the STB's unbiased ATC allocation rule.

*First,* commenters explained that there is nothing illogical about consistent uniform application of ATC to all cross-over traffic. *See, e.g.,* AAR Comments at 20-21 [J.A.081-082]; CSXT/NS Reply at 23-24 [J.A.169-70]; AAR Reply at 10 [J.A.157]. The ATC method allocates revenues in a manner that reflects economies of density and diminishing returns, without regard to whether a movement selected by the complainant for inclusion in its SARR traffic group generates relatively high revenues or relatively low revenues. *See* CSXT/NS Reply at 23 [J.A.169]; AAR Comments at 20-21 [J.A.081-082]. This is fully consistent with the STB's intention in adopting an unbiased methodology that allocates revenues in proportion to each segment's average total costs. *See Major Issues* at 31, 33-35; *cf. NPRM* at 17-18 [J.A.068-069]. Whether the allocation of the revenues for a particular cross-over movement selected by the complainant results in revenues for a SARR segment that are above or below the defendant railroad's URCS variable costs for that segment is immaterial to the logic and objective application of the ATC rule. *See, e.g.,* AAR Comments at 20-21 [J.A.081-082]; Reply Comments of Union Pacific R.R. Co. at 8-9 (Dec. 7, 2012) ("UP Reply") [J.A.179-80].

41

As the STB recognized, there may be instances in which the revenue generated by traffic selected by the complainant is insufficient to cover the URCS variable costs of <u>either</u> segment of a cross-over movement. *See Decision* at 28 [J.A.038]. The STB did not characterize such a result as "illogical" or "implausible." Rather, it simply proposed to allocate those limited available revenues in accordance with the movement's R/VC ratio. *See id.* If it is not illogical for allocated revenues to be insufficient to cover URCS variable costs of <u>both</u> segments of a cross-over movement, *a fortiori* allocation of revenues in an amount below URCS variable costs for <u>one</u> segment could not be illogical.

If a complainant exercises its discretion to select a segment of a low-rated movement for its SARR traffic group, that segment necessarily will be allocated relatively low revenue. And, it is entirely logical and intended that ATC allocates to the segment of a movement with lower average total costs (typically a higher density on-SARR segment) proportionally lower revenues than the higher average total cost segment. *See* AAR Comments at 20 [J.A.081]; CSXT/NS Reply at 23 [J.A.169]. Thus, the fact that the revenue allocated to a low average total cost segment of a low-rated cross-over movement may fall below the defendant

42

carrier's allocated variable cost for that segment of the movement is logical,

plausible, and unremarkable. *See id.*[40]

  *Second,* CSXT/NS and other commenters demonstrated that comparison of

the revenue allocated to the SARR with the defendant carrier's variable costs is

misguided and provides no basis for changing the STB's revenue allocation rule.

*See, e.g.,* CSXT/NS Reply at 23-24 [J.A.169-70]; AAR Comments at 21-22

[J.A.082-083]. The hypothetical SARR is designed and intended to be an

optimally efficient least-cost replacement for the defendant carrier. *See Coal Rate*

*Guidelines*, 1 I.C.C.2d at 542-43; AAR Comments at 21-22 [J.A.082-083]. By

definition, the variable costs of the optimally efficient SARR are well below those

of the real-world defendant carrier. *See* AAR Comments at 21-22 [J.A.082-083].

Thus, even if comparison of variable costs for an on-SARR segment to its

allocated revenues were a relevant consideration, the only meaningful comparison

would be between the SARR's variable costs and the SARR's revenue allocation.

Comparison of the on-SARR segment's revenue allocation to the defendant

---

[40] In the *Decision*, the STB claimed that *Major Issues* intended ATC to allocate cross-over revenue in accordance with relative average costs "*without* driving the revenue allocation below variable costs." *Decision* at 30 [J.A.040]. However, *Major Issues* said nothing about a goal of ensuring that revenue allocations exceeded variable costs for a segment, let alone the defendant carrier's URCS variable costs. The STB sought to apply this additional limitation in the present rulemaking, not in *Major Issues*. As CSXT/NS and other commenters demonstrated, the STB's premise and rationale for modifying the ATC methodology are erroneous and inconsistent with the goal of allocating all cross-over revenues in accordance with relative average total costs.

carrier's real world variable costs (assigned to a segment over which the defendant carrier does not operate and thus does not incur variable costs) is neither logical nor meaningful; it is like comparing watermelons to mangos. *See* CSXT/NS Reply at 23-24 [J.A.169-70]; AAR Comments at 21-22 [J.A.082-083].

*Third*, commenters showed that even putting aside the problem of comparing the defendant carrier's costs with the SARR's revenues, URCS system average costs are not a reliable measure of variable costs for a given segment. As the STB has acknowledged, URCS costs may include significant costs that are unattributable joint and common costs rather than variable costs. *See* AAR Comments at 21 [J.A.082]. Further, URCS is based on a carrier's system average variable costs, *i.e.* its average costs over a network of diverse terrain, conditions, and costs. URCS is not intended to calculate the costs attributable to a selected, artificial segment of a specific individual movement.[41] *See id.*

Thus, commenters demonstrated that, contrary to the STB's assumption, comparison of URCS system average costs assigned to a single line segment with the cross-over revenues allocated to that segment is not meaningful. Because URCS costs are not segment specific and because they include costs other than variable costs, such a comparison does not show whether an ATC revenue

---

[41] As discussed, URCS spreads the system average costs over the entirety of a real-world movement, without adjusting for the specific costs of a particular segment of that movement.

allocation would cover a segment's actual variable costs or make a contribution to its fixed, joint and common costs. *See, e.g.,* AAR Comments at 20-22 [J.A.081-083]. Accordingly, even if comparing applicable, accurate variable costs of a specific segment to its revenues were relevant to the validity of ATC revenue allocations—and it is not—the STB's proposed rule amendment was based on a different, invalid comparison.

*Fourth,* commenters pointed out that complainants have sole discretion to select whatever traffic they wish for inclusion in their SARR traffic group, and whether to designate that traffic as cross-over traffic. *See, e.g.,* CSXT/NS Reply at 23 [J.A.169]; CSXT/NS Comments at 17 n.8 [J.A.118]. Complainants select and designate cross-over traffic with full knowledge of how the ATC method allocates revenues. Complainants may select low-rated traffic for their SARR precisely because it increases traffic density on the lines of the SARR, which confers other benefits in the SAC analysis. *See* CSXT/NS Reply at 23 [J.A.169]. Indeed, a complainant presumably would not select a movement for its SARR traffic group if the revenue allocated to that movement made zero or negative contribution to the SARR's joint and common costs. *Id.* More generally, if it were illogical or a net disadvantage to include a particular movement in its SARR traffic group, a rational complainant would not select that movement. *Id.*; AAR Comments at 21-22 [J.A.082-083]. Plainly, complainants selecting low-rated cross-over traffic that

45

results in SARR revenue allocations below the defendant's URCS variable cost do not regard that revenue allocation as "illogical."  These comments further demonstrated the fallacy of the STB's predicate for modifying the ATC rule and thereby diluting the effect of economies of density.  *See* AAR Comments at 20-21 [J.A.081-082]; CSXT/NS Reply at 23-24 [J.A.169-70].

*Fifth,* a railroad commenter contended that it makes no sense to attempt to evaluate whether revenues for artificial segments of a hypothetical inter-line movement would cover their variable costs or make contribution to their fixed, joint and common costs.  *See, e.g.,* UP Reply at 8-9 [J.A.179-80].  Because in the real world a carrier must move traffic the full distance from origin to destination on its system in order to earn revenue for the transportation service, no real world carrier earns contribution or "profits" on a selected segment of that movement.  *Id.* Accordingly, it is meaningless to consider whether a particular movement generates such a contribution on any selected segment.  *Id.* at 9 [J.A.180].  Thus, the whole notion of "contribution" and relative contribution of different segments is irrelevant to the validity of the STB's determination to allocate cross-over revenues in accordance with average total costs.  *Id.*  The STB determined in *Major Issues* that assigning revenues to artificial segments of a single movement should be done by allocating revenues in proportion to the segments' relative average costs, thereby consistently accounting for economics of density.

46

Questions of the relationship between allocated revenues and some other cost

metric are irrelevant to this exercise.  *Id.* at 8-10 [J.A.179-81].

### 2.    Comment Regarding STB-Proposed Limits On Use of Cross-Over Traffic Device.

The STB also proposed to limit substantially the use of cross-over traffic, to

address a disconnect between URCS costs assigned to SARR segments and the

lower trainload costs that would be incurred on such SARR segments.  *See NPRM*

at 16-17 [J.A.067-068].  In response, CSXT/NS pointed out that if—and only if—

the STB properly calculated the SARR-specific variable costs of each cross-over

movement instead of using the defendant's system average URCS costs and used

those costs to allocate revenues, the proposed limits on cross-over traffic would not

be necessary.  *See* CSXT/NS Comments at 17-18 [J.A.118-19]; CSXT/NS Reply at

21 [J.A.167].

### B.    The STB Did Not Address Comments Demonstrating That the Purported Problem Was Illusory.

Under the APA, a reviewing court must set aside an agency action if it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A).  With respect to rules adopted in notice-and-comment

rulemaking, "a regulation will be deemed arbitrary and capricious, if the issuing

agency failed to address significant comments raised during the rulemaking."

*Private Sector Colleges*, 681 F.3d at 441.  Similarly, an agency rule or regulation

must be found arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *See State Farm*, 463 U.S. at 43. The STB's decision to amend the ATC rule by adopting Alternative ATC is arbitrary and capricious because the agency utterly failed to respond to significant comments and objections to the proposed change—including comments showing that the predicate for the proposed change was erroneous and provided no basis for amending the rule. The new Alternative ATC rule adopted in the *Decision* must be vacated.

The STB did not provide any meaningful explanation in the *NPRM* or the *Decision* of why it deemed the possibility of revenue allocations below the defendant carrier's URCS variable costs for a segment to be "illogical," "implausible" or otherwise a flaw requiring a change to the ATC rule. *Decision* at 28-34 [J.A.038-044]. In particular, the *Decision* did not address comments showing that the putative "problem" the STB had identified as the basis for amending the ATC rule was not a problem, but rather the appropriate operation of ATC to allocate revenues generated by all cross-over traffic in a logical and consistent manner. Instead, the *Decision* simply repeated its unexplained and unexamined premise—that the STB sought to "avoid driving the revenue allocation below variable costs"—without responding to comments showing such a result was not a flaw but rather the proper operation of the unbiased ATC

48

methodology to low-rated traffic in some circumstances.  *Id.* at 28 [J.A.038]; *cf.* AAR Comments at 20-21 [J.A.081-082] ("The Board has never articulated a rationale why the governing assumption of ATC should not be expected to hold true for low-rated traffic").

The APA requires an agency to <u>respond</u> to comments.  *See PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) ("An agency's failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious.") (internal quotation marks omitted).  An administrative agency is obliged "to respond[] in a reasoned manner to significant comments received" during the rulemaking process.  *U.S. Satellite Broad. Co. v. FCC*, 740 F.2d 1177, 1188 (D.C. Cir. 1984).  As this Court has long held, "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public."  *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977); *see Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (same).  Without agency response to significant comments, a reviewing court cannot satisfy its obligation to assure that the agency has considered all relevant factors.  *Home Box Office* at 36 (*citing Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)); *see also PPL Wallingford Energy*, 419 F.3d at 1198-1200 (vacating agency orders because agency failed to respond directly to facially legitimate

49

objections raised by petitioners); *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011).

The comments of CSXT/NS and other rail carriers on the proposed change to the ATC rule were significant and important. Those comments pointed out at least five important issues and fundamental flaws in the STB's reasoning and proposal:

- Rail carrier comments highlighted an important threshold error in the STB's perception of the "problem"—that it was not a problem but rather an entirely logical and consistent application of a method designed to allocate revenues in accordance with the "defining characteristics" of railroads, economies of scale and density.

- Comparing SARR revenues to the variable costs of the defendant carrier was neither meaningful or logical because the SARR is optimally-efficient and would have different variable costs on the on-SARR segment that defendant carrier would have in the real world.

- Even if comparison of the defendant's variable costs with the SARR's revenue allocation were relevant, use of the defendant carrier's system-wide average URCS costs as the variable costs of a particular segment for purposes of such a comparison would be inappropriate both because that segment may have significantly different costs than the carrier's overall

50

average costs, and because some URCS costs are unattributable joint, and common costs, <u>not</u> variable costs.

- ATC revenue allocations are not illogical because fully informed complainants acting in their own rational self interest knowingly choose to include in their traffic groups cross-over movements that yield the very revenue allocations the Board labeled "illogical."

- It makes no sense for the Board to be concerned about whether allocated revenues for artificial segments of the hypothetical inter-line movement would cover variable costs (however measured) because in the real-world railroads price entire origin-to-destination movements, not segments of those movements.

The STB utterly failed to respond to any of the foregoing significant comments submitted by the railroad parties.  In stark contrast, the Board devoted substantial time and space to responding to comments of shipper parties regarding the proposed change to the ATC rule and methodology.  *See Decision* at 30-34 [J.A.040-044].[42]

---

[42] The agency's pattern of failing to respond to carrier comments was by no means limited to the instances cited above.  Even in the single instance in which the STB acknowledged CSXT/NS's comments—concerning the agency's related proposal to limit complainants' use of the cross-over traffic device—it still provided no meaningful response to those comments.  CSXT/NS's conditional position was that <u>if</u> (A) the STB properly calculated the SARR-specific variable costs of each cross-over movement and used those costs to allocate revenues, <u>then</u> (B) the agency need

51

The *Decision*'s failure to provide any meaningful response to significant comments and objections raised by the railroads' comments renders it arbitrary and precludes a finding that the *Decision* is the product of rational decision making. *See State Farm*, 463 U.S. at 43 (agency decision is arbitrary and capricious if it "entirely fail[s] to consider an important aspect of a problem"); *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001) (reversing agency decision for failure to meaningfully address objections, holding that "[u]nless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned."); *Private Sector Colleges*, 681 F.3d at 441 ("a regulation will be deemed arbitrary and capricious if the issuing agency failed to address significant comments raised during the rulemaking").

Instead of responding to carrier comments, the STB simply repeated its conclusory premise that it is "illogical" for SARR revenue allocations to fall below the defendant carrier's variable costs. But an agency must address comments in more than a "conclusory manner." *See United Mine Workers*, 626 F.3d at 94

---

not impose the proposed limits on cross-over traffic. *See* CSXT/NS Comments at 17-18 [J.A.118-19]; CSXT/NS Reply at 21 [J.A.167]. The STB relied on CSXT/NS's statement that the proposed limits might not be necessary (*i.e.*, B) to justify its decision not to adopt the proposed limits, but conspicuously failed to address the necessary pre-condition to the carriers' position (*i.e.*, A). *See Decision* at 27-28 [J.A.037-038]. Thus, the agency not only failed to respond to the substance of the carriers' comments regarding the proposed cross-over traffic limits, it simultaneously purported to <u>rely</u> on those very same unaddressed comments to support its action.

(agency's attempt to address objections "in a conclusory manner is fatal to its defense of" a rule adopted despite those objections).  Without more, mere repetition of the STB's conclusory allegation that some potential revenue allocations produced by consistent application of the ATC rule would be "illogical" does not support or explain that conclusion and does not pass APA muster.  *See id.; McDonnell Douglas Corp v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (reviewing court does "not defer to the agency's conclusory or unsupported suppositions.").

Moreover, by declining to respond to comments showing that the STB had erred in identifying a particular potential application of its ATC rule as illogical or problematic, the agency also failed to "articulate a satisfactory explanation for its action" in amending the ATC rule.  *See Owner-Operator Indep. Drivers*, 494 F.3d at 203 (internal quotation marks omitted).  The agency's failure to address those comments further means it did not make a "rational connection between the facts found"—that when applied to low-rated traffic ATC may sometimes allocate revenues to a cross-over segment that do not fully cover the defendant's URCS variable costs for that segment—"and the choice made" —to amend ATC in a manner that reduces the effect of economies of density in the revenue allocation process.  *Id.*  Indeed, it is logically impossible for an agency to articulate a rational connection between a perceived problem and the choice it has made to address that

53

putative problem when it has not adequately described the problem or explained

why the agency believes it must be addressed.  Because of the Board's failures, the

Court cannot conclude that the agency's action was "the product of reasoned

decisionmaking."  *See id.*; *AEP*, 609 F.3d at 444 (remanding STB decision for

failure to consider an important aspect of a problem).  The *Decision*'s amendment

of the ATC cross-over revenue allocation rule accordingly must be vacated.

## IV.    THE STB'S FAILURE TO ACKNOWLEDGE OR ADDRESS EVIDENCE THAT ITS INTEREST RATE PROPOSAL WAS BASED ON A FALSE PREMISE WAS ARBITRARY AND CAPRICIOUS.

If the STB finds that a railroad's rate exceeds a reasonable maximum, it has

the authority to require the railroad to pay reparations to the shipper for any past

charges over that maximum, plus interest.  Twenty years ago, the ICC adopted the

interest rate on 90-day U.S. treasury bills ("T-Bill rate") as its interest rate for

reparations, finding that the T-Bill rate was "a universally-accepted short-term

baseline opportunity cost rate for all companies, regardless of the industry."

*Procedures to Calculate Interest Rates*, 9 I.C.C.2d 528, 534 (1993).

The *Decision*'s change to the regulatory interest rate for reparations violated

the APA because the STB failed to address evidence that the STB's stated premise

for making that change was incorrect.  Agencies are required to "'respond to

relevant and significant public comments.'"  *Cape Cod Hosp. v. Sebelius*, 630 F.3d

203, 211 (D.C. Cir. 2011) (quoting *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197

54

(D.C. Cir. 1993)).[43]  Here, the STB failed to acknowledge—let alone address—credible and convincing evidence that the predicates for the interest rate change stated in the *NPRM* and repeated in the *Decision* were false.  Therefore, this aspect of the *Decision* should be vacated and remanded for the agency to consider that evidence.

In the *NPRM*, the STB stated that it was "concerned" that the T-Bill rate was insufficiently compensatory and proposed to replace it with the U.S. Prime Rate. *NPRM* at 18 [J.A.069].  The STB observed that the interest rate for reparations should "correlate[] to market interest rates over a comparable time frame" and asserted that the U.S. Prime Rate satisfied this test because it was "the interest rate that the banks charge to their most creditworthy customers."  *Id.*  When the STB adopted the U.S. Prime Rate in the *Decision*, however, it failed to address record evidence that questioned each of these two premises.  Instead, the STB simply repeated its beliefs that the Prime Rate "correlates to market interest rates" and that it is the "rate that the banks charge to their most creditworthy customers." *Decision* at 35-36 [J.A.045-046].  The STB's reliance on factual assertions that are not supported by the record and its failure to "respond to relevant and significant

---

[43] *See City of New York v. FCC*, 814 F.2d 720, 727-28 (D.C. Cir. 1987) (failure to address comments raising relevant objection to proposed rule required remand for agency to address comments); *Home Box Office*, 567 F.2d at 35-36 ("[A] dialogue is a two-way street: the opportunity to comment is meaningless unless the agency responds to significant points raised by the public.").

public comments" violated the APA. *Cape Cod Hosp.*, 630 F.3d at 211; *see State Farm,* 463 U.S. at 43.

First, the STB failed to respond to evidence that the Prime Rate "does not purport to measure or reflect actual market interest rates." CSXT/NS Reply at 32 [J.A.174]. Rather, the Prime Rate reflects base rates used by large banks as reference points for further negotiations, and actual market interest rates can be higher or lower than the Prime Rate. *See id.* at 32-33 & nn.9-11 [J.A.174-75]. CSXT/NS pointed out that several major banks have disclaimed the Prime Rate as merely a "base rate" or a "pricing index" and have stated explicitly that they may price loans "at, above, or below the prime rate." *Id.* at 33 n.9 [J.A.175]. The STB's *Decision* did not even acknowledge, let alone address, any of this evidence; rather, the STB simply repeated the *NPRM*'s claim that the U.S. Prime Rate "correlates to market interest rates." *Decision* at 35 [J.A.045].

Similarly, the STB failed to address evidence that the Prime Rate index "is based almost entirely on the federal funds target rate established by the Federal Reserve's Federal Open Market Committee," and is typically set at three percentage points above that level. CSXT/NS Reply at 33-34 [J.A.175-76]. While the STB's description of the U.S. Prime Rate as the interest rate charged to a bank's most creditworthy customers is a common misconception that has been

56

repeated elsewhere,[44] CSXT/NS showed that it is not accurate.  CSXT/NS Reply

Comments at 32-33 [J.A.174-75].  The STB had an obligation under the APA to

grapple with that evidence and to either accept it or explain why it did not do so.

Ignoring the evidence was not a permissible option.

## CONCLUSION

For the reasons set forth above, this Court should vacate the STB's decisions

to remove the relief cap on Simplified-SAC cases, to raise the Three Benchmark

relief cap to $4 million, to adopt Alternative ATC, and to adopt the Prime Rate for

interest rate calculations.

---

[44] *See, e.g.*, *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996).
More recent decisions have recognized that the prime rate is not necessarily the
rate banks charge to their most creditworthy customers.  *See Lum v. Bank of
America*, 361 F.3d 217, 226-27 (3d Cir. 2004), *abrogation on other grounds
recognized by* 493 F. App'x 273 (3d Cir. 2012) (rejecting party's contention that
"prime rate" is generally understood to mean the lowest rate available to a bank's
most creditworthy customers).

57

Respectfully submitted,

/s/ G. Paul Moates

Peter J. Shudtz                                     G. Paul Moates
Paul R. Hitchcock                                   Paul A. Hemmersbaugh
John P. Patelli                                     Matthew J. Warren
CSX Transportation, Inc.                            Sidley Austin LLP
500 Water Street                                    1501 K Street, N.W.
Jacksonville, FL  32202                             Washington, D.C.  20005
                                                    (202) 736-8000
                                                    (202) 736-8711 (Fax)

James A. Hixon
John M. Scheib
David L. Coleman
Norfolk Southern Corporation
Three Commercial Place
Norfolk, VA  23510

*Counsel to Petitioners CSX Transportation, Inc. and
Norfolk Southern Railway Company*

Dated:  February 26, 2014

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and with this Court's Order of October 16, 2013 because this brief contains 13,861 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(ii).  I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure (32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman font.

/s/Matthew J. Warren
Matthew J. Warren

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d)(2), I hereby certify that on February 26, 2014, I caused two true and correct copies of the foregoing Final Opening Brief to be served by First Class U.S. Mail or more expeditious means upon the following parties:

> Erik G. Light
> Craig M. Keats
> Surface Transportation Board
> 395 E Street, S.W.
> Washington, D.C.  20043
>
> William J. Baer
> Kristen C. Limarzi
> Shana M. Wallace
> Department of Justice
> 950 Pennsylvania Avenue, N.W.
> Washington, D.C.  20530-0001

/s/Matthew J. Warren
Matthew J. Warren

## STATUTORY ADDENDUM

49 U.S.C. § 10701 ..................................................................... A-2

49 U.S.C. § 10704 ..................................................................... A-4

49 C.F.R. § 1111.9 .................................................................... A-6

49 C.F.R. § 1141.1 (former version before amendment by *Decision*) ............ A-9

49 C.F.R. § 1141.1 (current version after amendment by *Decision*) ............... A-11

## A.    49 U.S.C. § 10701

**Standards for rates, classifications, through routes, rules, and practices**

(a)    A through route established by a rail carrier must be reasonable. Divisions of joint rates by rail carriers must be made without unreasonable discrimination against a participating carrier and must be reasonable.

(b)    A rail carrier providing transportation subject to the jurisdiction of the Board under this part may not discriminate in its rates against a connecting line of another rail carrier providing transportation subject to the jurisdiction of the Board under this part or unreasonably discriminate against that line in the distribution of traffic that is not routed specifically by the shipper.

(c)    Except as provided in subsection (d) of this section and unless a rate is prohibited by a provision of this part, a rail carrier providing transportation subject to the jurisdiction of the Board under this part may establish any rate for transportation or other service provided by the rail carrier.

(d)    (1)    If the Board determines, under section 10707 of this title, that a rail carrier has market dominance over the transportation to which a particular rate applies, the rate established by such carrier for such transportation must be reasonable.

    (2)    In determining whether a rate established by a rail carrier is reasonable for purposes of this section, the Board shall give due consideration to—

        (A)    the amount of traffic which is transported at revenues which do not contribute to going concern value and the efforts made to minimize such traffic;

        (B)    the amount of traffic which contributes only marginally to fixed costs and the extent to which, if any, rates on such traffic can be changed to maximize the revenues from such traffic; and

        (C)    the carrier's mix of rail traffic to determine whether one commodity is paying an unreasonable share of the carrier's overall revenues, recognizing the policy of this part that rail carriers shall earn adequate revenues, as established by the Board under section 10704(a)(2) of this title.

A-2

(3)    The Board shall, within one year after January 1, 1996, complete the pending Interstate Commerce Commission non-coal rate guidelines proceeding to establish a simplified and expedited method for determining the reasonableness of challenged rail rates in those cases in which a full stand-alone cost presentation is too costly, given the value of the case.

### B.    49 U.S.C. § 10704

**Authority and criteria: rates, classifications, rules, and practices prescribed by Board**

(a)    (1)    When the Board, after a full hearing, decides that a rate charged or collected by a rail carrier for transportation subject to the jurisdiction of the Board under this part, or that a classification, rule, or practice of that carrier, does or will violate this part, the Board may prescribe the maximum rate, classification, rule, or practice to be followed. The Board may order the carrier to stop the violation. When a rate, classification, rule, or practice is prescribed under this subsection, the affected carrier may not publish, charge, or collect a different rate and shall adopt the classification and observe the rule or practice prescribed by the Board.

        (2)    The Board shall maintain and revise as necessary standards and procedures for establishing revenue levels for rail carriers providing transportation subject to its jurisdiction under this part that are adequate, under honest, economical, and efficient management, to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business. The Board shall make an adequate and continuing effort to assist those carriers in attaining revenue levels prescribed under this paragraph. Revenue levels established under this paragraph should—

            (A)    provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation; and

            (B)    attract and retain capital in amounts adequate to provide a sound transportation system in the United States.

        (3)    On the basis of the standards and procedures described in paragraph (2), the Board shall annually determine which rail carriers are earning adequate revenues.

(b)    The Board may begin a proceeding under this section only on complaint. A complaint under subsection (a) of this section must be made under section

11701 of this title, but the proceeding may also be in extension of a complaint pending before the Board.

(c)    In a proceeding to challenge the reasonableness of a rate, the Board shall make its determination as to the reasonableness of the challenged rate—

   (1)    within 9 months after the close of the administrative record if the determination is based upon a stand-alone cost presentation; or

   (2)    within 6 months after the close of the administrative record if the determination is based upon the methodology adopted by the Board pursuant to section 10701(d)(3).

(d)    Within 9 months after January 1, 1996, the Board shall establish procedures to ensure expeditious handling of challenges to the reasonableness of railroad rates. The procedures shall include appropriate measures for avoiding delay in the discovery and evidentiary phases of such proceedings and exemption or revocation proceedings, including appropriate sanctions for such delay, and for ensuring prompt disposition of motions and interlocutory administrative appeals.

### C.     49 C.F.R. § 1111.9

**Procedural schedule in cases using simplified standards.**

(a)     Procedural schedule. Absent a specific order by the Board, the following general procedural schedules will apply in cases using the simplified standards:

(1)     In cases relying upon the Simplified-SAC methodology:

Day 0—Complaint filed (including complainant's disclosure).

Day 10—Mediation begins.

Day 20—Defendant's answer to complaint (including defendant's initial disclosure).

Day 30—Mediation ends; discovery begins.

Day 140—Defendant's second disclosure.

Day 150—Discovery closes.

Day 220—Opening evidence.

Day 280—Reply evidence.

Day 310—Rebuttal evidence

Day 320—Technical conference (market dominance and merits).

Day 330—Final briefs.

(2)     In cases relying upon the Three-Benchmark method:

Day 0—Complaint filed (including complainant's disclosure).

Day 10—Mediation begins. (STB production of unmasked Waybill Sample.)

Day 20—Defendant's answer to complaint (including defendant's initial disclosure).

Day 30—Mediation ends; discovery begins.

A-6

Day 60—Discovery closes.

Day 90—Complainant's opening (initial tender of comparison group and opening evidence on market dominance). Defendant's opening (initial tender of comparison group).

Day 95—Technical conference on comparison group.

Day 120—Parties' final tenders on comparison group. Defendant's reply on market dominance.

Day 150—Parties' replies to final tenders. Complainant's rebuttal on market dominance.

(b)     Defendant's second disclosure. In cases using the Simplified-SAC methodology, the defendant must make the following disclosures to the complainant by Day 170 of the procedural schedule.

    (1)     Identification of all traffic that moved over the routes replicated by the SARR in the Test Year.

    (2)     Information about those movements, in electronic format, aggregated by origin-destination pair and shipper, showing the origin, destination, volume, and total revenues from each movement.

    (3)     Total operating and equipment cost calculations for each of those movements, provided in electronic format.

    (4)     Revenue allocation for the on-SARR portion of each cross-over movement in the traffic group provided in electronic format.

    (5)     Total trackage rights payments paid or received during the Test Year associated with the route replicated by the SARR.

    (6)     All workpapers and documentation necessary to support the calculations.

(c)     Conferences with parties. The Board may convene a conference of the parties with Board staff to facilitate voluntary resolution of discovery disputes and to address technical issues that may arise.

(d)     Complaint filed with a petition to revoke a class exemption. If a complaint is filed simultaneously with a petition to revoke a class exemption, the Board

will take no action on the complaint and the procedural schedule will be held in abeyance automatically until the petition to revoke is adjudicated.

**D.    49 C.F.R. § 1141.1 (former version before amendment by**
      ***Decision*)**

**Procedures to calculate interest rates.**

(a)    For purposes of complying with a Board decision in a complaint or
       investigation proceeding, interest rates to be computed shall be the coupon
       equivalent yield (investment rate) of marketable securities of the United
       States Government having a duration of 91 days (3 months). The rate levels
       will be determined as follows:

   (1)    For investigation proceedings, the interest rate shall be the coupon
          equivalent yield in effect on the date the statement is filed accounting
          for all amounts received under the new rates (See 49 U.S.C.
          10707(d)(1) ).

   (2)    For complaint proceedings, the interest rate shall be the coupon
          equivalent yield in effect on the first day of the calendar quarter in
          which an unlawful charge is paid. The interest rate in complaint
          proceedings shall be updated as of the first day of all subsequent
          calendar quarters, at the coupon equivalent yields in effect on those
          days. Updating will continue until the required reparation payments
          are made.

   (3)    For purposes of this section, coupon equivalent yields shall be
          considered "in effect" on the date the securities are issued, not on the
          date they are auctioned. If the date the statement is filed (for
          investigation proceedings) or if the first day of the calendar quarter
          (for complaint proceedings) is the same as the issue date, then the
          yield on that date shall be used.

(b)    Interest in a complaint or investigation proceeding shall be compounded
       quarterly, as follows:

   (1)    For investigation proceedings, the reparations period shall begin on
          the date the investigation is started. Thus, unless by coincidence, the
          quarterly compounding periods in investigation proceedings will not
          coincide with the calendar quarters.

   (2)    For complaint proceedings, the reparations period shall begin on the
          date the unlawful charge is paid. However, in order for the quarterly
          compounding periods in complaint cases to coincide with the calendar

quarters (so that only one interest rate is in effect during each compounding period), the first compounding period shall run from the date the unlawful charge is paid to the last day of the current calendar quarter, and all subsequent compounding periods shall coincide with the calendar quarters.

(3)     For both investigation and complaint proceedings, the annual effective interest rate shall be the same as the annual nominal (or stated) rate. Thus, the nominal rate must be factored exponentially to the power representing the portion of the year covered by the interest rate. A simple multiplication of the nominal rate by the portion of the year covered by the interest rate would not be appropriate because it would result in an effective rate in excess of the nominal rate. Under this "exponential" approach, the total cumulative reparations payment (including interest) is calculated by multiplying the interest factor for each quarterly period (or part thereof) by the principal amount for that period plus any accumulated interest from previous periods. The "interest factor" for each period is 1.0 plus the interest rate for that period to the power representing the portion of the year covered by the interest rate. As an example, if the annual interest rate for the quarter is 5.6 percent, then the interest factor would be 1.01368, or 1.056 to the power of 91/365.

**E.      49 C.F.R. § 1141.1 (current version after amendment by *Decision*)**

**Procedures to calculate interest rates.**

(a)     For purposes of complying with a Board decision in an investigation or complaint proceeding, interest rates to be computed shall be the most recent U.S. Prime Rate as published by The Wall Street Journal.  The rate levels will be determined as follows:

(1)     For investigation proceedings, the interest rate shall be the U.S. Prime Rate as published by The Wall Street Journal in effect on the date the statement is filed accounting for all amounts received under the new rates.

(2)     For complaint proceedings, the interest rate shall be the U.S. Prime Rate as published by The Wall Street Journal in effect on the day when the unlawful charge is paid. The interest rate in complaint proceedings shall be updated whenever The Wall Street Journal publishes a change to its reported U.S. Prime Rate.  Updating will continue until the required reparation payments are made.

(b)     For investigation proceedings, the reparations period shall begin on the date the investigation is started.  For complaint proceedings, the reparations period shall begin on the date the unlawful charge is paid.

(c)     For both investigation and complaint proceedings, the annual percentage rate shall be the same as the annual nominal (or stated) rate.  Thus, the nominal rate must be factored exponentially to the power representing the portion of the year covered by the interest rate.  A simple multiplication of the nominal rate by the portion of the year covered by the interest rate would not be appropriate because it would result in an effective rate in excess of the nominal rate.  Under this "exponential" approach, the total cumulative reparations payment (including interest) is calculated by multiplying the interest factor for each period by the principal amount for that period plus any accumulated interest from previous periods.  The "interest factor" for each period is 1.0 plus the interest rate for that period to the power representing the portion of the year covered by the interest rate.